**In re Joan Orie MELVIN, Justice of the Supreme Court of Pennsylvania.**

**No. 5 JD 12.**

Court of Judicial Discipline of Pennsylvania.

Aug. 30, 2012.

Before CURRAN, P.J., MORRIS, CLEMENT, JR., McGINLEY, CELLUCCI, and McCUNE, JJ.

PER CURIAM.

AND NOW, this 30th day of August, 2012, upon consideration of the Petition for Relief of the Judicial Conduct Board Requesting Interim Suspension Without Pay of the above-named Judicial Officer, the Respondent's Response to Per Curiam Order of Hearing on Suspension and Pay Issues, the Judicial Conduct Board's Response thereto, the Judicial Conduct Board's Pre-Hearing Statement and Motion for Continuance, the Respondent's Concurrence thereto, and upon consideration of the Respondent's Hearing Brief for August 14, 2012 Argument on Suspension and Pay Issues and Respondent's Supplemental Hearing Brief, and after oral argument, it is hereby ORDERED that:

1. The Petition for Relief of the Judicial Conduct Board Requesting Interim Suspension Without Pay is hereby granted.

2. Pursuant to the authority of Article V, §18(d)(2) of the Pennsylvania Constitution, Justice Joan Orie Melvin is hereby SUSPENDED WITHOUT PAY from the date of this Order until further Order of this Court.

3. The medical benefits of the Respondent shall not be suspended during the effectiveness of this Interim Order.

## ORDER

OPINION BY Judge CURRAN.

### I. *INTRODUCTORY STATEMENT*

We have before us the Petition of the Judicial Conduct Board ("Board") for an Interim Order Suspending Respondent, Justice Joan Orie Melvin, from her judicial office Without Pay. The Board seeks this order under Article V, § 18(d)(2) of the

Pennsylvania Constitution. That section provides:

Prior to a hearing, the court may issue an interim order directing the suspension, with or without pay, of any justice, judge or justice of the peace against whom formal charges have been filed with the court by the board or against whom has been filed an indictment or information charging a felony. An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.[1]

### II. *FINDINGS OF FACT*

1. Since January 2010, Justice Orie Melvin has served as a Justice of the Supreme Court of Pennsylvania. Prior to her election to the Supreme Court, Justice Orie Melvin served as a Judge of the Superior Court of Pennsylvania from January 1998 until December 2009. Before her service on the appellate courts, Justice Orie Melvin served as Judge of the Court of Common Pleas of Allegheny County and as a Magistrate Judge for the City of Pittsburgh.

2. In 2003, while a sitting Superior Court Judge, Justice Orie Melvin campaigned for election to the Supreme Court of Pennsylvania, but she was unsuccessful.

3. In 2009, while a sitting Superior Court Judge, Justice Orie Melvin campaigned for election to the Supreme Court of Pennsylvania and was successful.

4. During Respondent's 2003 and 2009 campaigns her sister, Janine Orie, was employed as office manager of Respondent's judicial office.

5. During Respondent's 2003 and 2009 campaigns her sister, Jane Orie, was employed as a member of the Senate of Pennsylvania.

6. During both the 2003 and 2009 cam-

---

1. Thus, Section 18(d)(2) authorizes this Court to enter such an order in cases where a justice, judge or justice of the peace has been charged with a felony—whether or not the Board files a complaint in this Court, and also in cases where the Board files a complaint in

this Court—whether or not the justice, judge or justice of the peace has been charged with a felony. The Constitution does not make this Court's authority to enter such interim orders conditional upon a request from the Board that we do so.

paigns Respondent had a judicial staff which included secretaries and law clerks, all employed by the Superior Court of Pennsylvania, including Lisa Sasinoski, Cathy Skidmore, Kathy Squires, Molly Creenan and John Degener.

7. During both the 2003 and 2009 campaigns Senator Jane Orie Melvin had a legislative staff, all employed by the Senate of Pennsylvania, including Susan Cochran, Jason Davidek, Josh Dott, Jamie Pavlot, Barbara Brown and Ginger Hope.

8. The 2003 and 2009 campaign activity of sisters, Respondent Joan Orie Melvin, Janine Orie, and former Senator Jane Orie, was the subject of an investigation by the Allegheny County District Attorney's Office and the 2010 Allegheny County Investigating Grand Jury (the Grand Jury) for potential violations of the Pennsylvania Crimes Code, Title 18 Pa.C.S.A., having to do with the alleged use of Commonwealth paid-employees of Justice Orie Melvin and former Senator Orie to perform political campaign work for Justice Joan Orie Melvin while on Commonwealth time.

9. As a result of its investigation into the activity of Respondent, on May 17, 2012, the Grand Jury returned a Presentment in which it recommended that nine criminal charges be made against Respondent.

10. Based upon the said Recommendations of the Grand Jury, on May 18, 2012, the District Attorney of Allegheny County filed a Criminal Information in Allegheny County charging Respondent with the following crimes in nine Counts:

A. Theft of Services—Di version of Services [18 Pa.C.S.A. § 3926(b) ]— Felony of the Third Degree—3 Counts

*Count 1.* Having control over the disposition of services of others to which the Defendant was not entitled, the Defendant knowingly diverted such services valued in excess of $2000.00 to her own benefit when she utilized a member of her judicial staff, namely her sister, Janine Orie, to facilitate and promote then-Judge Joan Orie Melvin's election campaigns for a position on the Supreme Court of Pennsylvania at various diverse times in both 2003 and 2009.

*Count 2.* Having control over the disposition of services of others to which the Defendant was not entitled, the Defendant personally and also through accomplices Janine Orie and Jane Orie, knowingly diverted such services valued in excess of $2000.00 to her own benefit when at various diverse times she utilized members of her judicial staff, including Lisa Sasinoski, Molly Creenan, Kathy Squires, and others, to facilitate and promote then-Judge Joan Orie Melvin's political campaigns for a position on the Supreme Court of Pennsylvania during election cycles in both 2003 and 2009.

*Count 3.* Having control over the disposition of services of others to which the Defendant was not entitled, the Defendant personally and also through accomplices Janine Orie and Janie Orie, knowingly diverted such services valued in excess of $2000.00 to her own benefit when at various diverse times she utilized certain members of the Pennsylvania Senatorial staff of her sister, Senator Jane C. Orie, to facilitate and promote then-Judge Joan Orie Melvin's political campaigns for a position on the Supreme Court of Pennsylvania during election cycles in both 2003 and 2009, those legislative staffers including, but not being limited to, Sharon Cochran, Jason Davidek, Josh Dott and Jamie Pavlot.

B. Criminal Conspiracy to Commit Theft of Services—Diversion of Services—[18 Pa.C.S.A. § 903, 3926(b) ]—Felony of the Third Degree

Defendant conspired with co-conspirators Janine Orie and Senator Jane Orie,

to direct staffers from both Judge Orie Melvin's Superior Court judicial staff, including Lisa Sasinoski, Molly Creenan, Kathy Squires and others, and also certain staffers from Senator Jane Orie's legislative staff including Sharon Cochran, Jason Davidek, Josh Dott, and Jamie Pavlot, to facilitate and promote Defendant's election campaigns for higher judicial office as a Justice of the Pennsylvania Supreme Court in both 2003 and 2009.

C. Criminal Conspiracy to Commit Tampering With Physical Evidence—[18 Pa.C.S.A. § 903, 4910]— Misdemeanor of the Second Degree

Defendant conspired with Senator Jane Orie, when, believing that an official investigation was pending or about to be initiated, encouraged or requested Jamie Pavlot to engage in conduct that would constitute the crime of Tampering With Physical Evidence, or that would establish Defendant's complicity in the said crime, when the Defendant, while on a telephone call with her sister, Senator Jane Orie and Senator Jane Orie's Chief of Staff Jamie Pavlot, told Pavlot to remove any political documents from two boxes of materials which Pavlot had removed from Senator Orie's senatorial district office on Sunday, November 1, 2009.

D. Criminal Solicitation to Tamper With or Fabricate Physical Evidence—[18 Pa.C.S.A. § 902 and 4910(1) ]—Misdemeanor of the Second Degree

With the intent of promoting or facilitating the crime of Tampering With Physical Evidence, the Defendant, believing that an official investigation was pending or about to be initiated, encouraged or requested Jamie Pavlot to engage in conduct that would constitute the crime of Tampering With Physical Evidence, or that would establish Defendant's complicity in the said crime, when the Defendant, while on a telephone call with

her sister, Senator Jane Orie and Senator Jane Orie's Chief of Staff Jamie Pavlot, told Pavlot to remove any political documents from two boxes of materials which Pavlot had removed from Senator Orie's senatorial district office on Sunday, November 1, 2009.

E. Official Oppression [18 Pa.C.S.A. § 5301]—Misdemeanor of the Second Degree—2 Counts

*Count 1.* Defendant, personally and through accomplice Janine Orie, unlawfully subjected a member of then-Judge Joan Orie Melvin's Superior Court staff, to wit, Lisa Sasinoski, to infringement of her personal or property rights, and denied and/or impeded that member of Joan Orie Melvin's judicial staff in the exercise or enjoyment of her rights, privileges, powers or immunities, that is by requiring her to perform political and campaign related acts in 2003 that were prohibited by Pennsylvania Supreme Court Order of Court and Procedures for all court personnel and/or by requiring her to perform political and campaign related acts during office hours when use of state employees in that manner violated Pennsylvania criminal law, and/or by terminating her employment with the Court after she expressed concerns about such work.

*Count 2.* Defendant, personally and through accomplice Janine Orie, unlawfully subjected a member of then-Judge Joan Orie Melvin's Superior Court staff, to wit, Molly Creenan, to infringement of her personal or property rights, and denied and/or impeded that member of Joan Orie Melvin's judicial staff in the exercise or enjoyment of rights, privileges, powers, or immunities, that is by requiring her to perform political and campaign related acts in 2003 and 2009 that were prohibited by Pennsylvania Supreme Court Order of Court and Procedures for all court personnel and/or by requiring her to perform political and

campaign related acts during office hours when use of state employees in that manner violated Pennsylvania criminal law, and/or by continuing to exert pressure on Creenan to perform political work despite her expressed opposition.

    F.   Misapplication of Entrusted Property of Government—[18 Pa.C.S.A. § 4113(a) ]—Misdemeanor of the Second Degree

As a Judge of the Pennsylvania Superior Court, Defendant personally, and through an accomplice Janine Orie, used her Superior Court office facilities and office equipment to facilitate and promote Orie Melvin's political campaign activities in her bid for higher judicial office as a Justice of the Pennsylvania Supreme Court in both 2003 and 2009.

11.   Thereafter, on July 30 and 31, 2012, a Preliminary Hearing was held before Magisterial District Judge James J. Hanley, Jr. Ten witnesses testified at that hearing over the course of two full days. At the conclusion of the testimony and after hearing argument of counsel, Magisterial District Judge Hanley held that the Commonwealth had established a *prima facie* case as to all the charges except those designated as D. Criminal Solicitation and E. Official Oppression, Count 2.

12.   On May 18, 2012 the Board filed its Complaint against Respondent in this Court as well as a Petition for Relief Requesting Interim Suspension With Pay.

13.   On May 22, 2012 this Court entered an Order which provided;

    a) that Respondent be immediately suspended from all of her duties as a Justice of the Supreme Court of Pennsylvania until further Order of this Court;

    b) that any medical benefits to which Respondent is presently entitled shall not be affected by this Order; and

    c) that argument was to be held on June 12, 2012 "to consider any objections to the continuation of this suspension and to determine whether the interim suspension of Respondent should be with or without pay."

14.   On June 12, 2012 and on August 14, 2012 this Court heard the arguments of counsel on the question of whether Respondent's interim suspension should be with pay or without pay.

15.   In addition, this Court has reviewed the charges contained in the Criminal Information filed by the District Attorney as well as the testimony which led the Grand Jury to make the Recommendations set out in its Presentment as well as the testimony and exhibits presented at the Preliminary Hearing.

## III.  *DISCUSSION*

Because an Information has been filed against Respondent charging her with felonies, § 18(d)(2) of Article V of the Constitution authorizes this Court to enter an interim order now—prior to a hearing—suspending her with or without pay.

The constitutional amendments of 1993, establishing this Court of Judicial Discipline, invest this Court with authority to enter two different types of orders.

The first—the type we are most frequently requested to enter—is an order imposing a sanction against a judicial officer. This type of order is authorized by Article V, § 18(b)(5) of the Constitution and is to be entered in cases where the Board has filed formal charges, and only after "a hearing or hearings." Section 18(b)(5) also specifies certain rights to which judicial officers shall be entitled in such hearings. Orders under § 18(b)(5) are final and appealable.

The second type of order which the Constitution empowers this Court to enter is authorized by Article V, § 18(d)(2). These orders are styled "interim orders" and are authorized to be entered "prior to a hearing." These orders are not final and are not appealable.

   ■  We hold that the rights set out in

§ 18(b)(5) as available to judicial officers in proceedings leading to final orders of sanctions are not available in interim proceedings under § 18(d)(2). The fundamental constitutional scheme negates any other conclusion. We also hold that that constitutional scheme in no way offends any overweening notion of due process which may be said to derive from the Constitutions of the United States or of Pennsylvania.[2]

Section 18(b)(5) of Article V provides:

Upon the filing of formal charges with the court by the board, the court shall promptly schedule a hearing or hearings to determine whether a sanction should be imposed against a justice, judge or justice of the peace pursuant to the provisions of this section. The court shall be a court of record, with all the attendant duties and powers appropriate to its function. Formal charges filed with the court shall be a matter of public record. All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence. All decisions of the court shall be in writing and shall contain findings of fact and conclusions of law. A decision of the court may order removal from office, suspension, censure or other discipline as authorized by this section and as warranted by the record.

It is obvious that the provisions of this section, including those specifying various rights to be afforded the subject of the charges, are intended to apply in cases where formal charges have been filed and where the Court is asked "to determine whether a sanction should be imposed." The sanctions imposed under this section are final—not interim. It is not surprising that, in such a context, the drafters of the Constitution would require that principles of due process be observed or that the Respondent be presumed innocent or that the burden of proof be clear and convincing evidence.

It is also obvious that this process will take time; and, if a sanction is found to be called for, a separate hearing will be required to determine the appropriate sanction, which will take more time, and if an appeal from a final order of sanction is taken to the Supreme Court, this will take even more time.

We believe that it is obvious that it was the recognition that substantial time would necessarily pass between the time a judicial officer was charged and the time when an order of removal or suspension could be effected, that impelled the drafters to provide for the expeditious entry of "interim orders," and so they did, in § 18(d)(2) of Article V. It was only by empowering this Court to suspend "prior to a hearing," i.e., without a hearing, that the integrity of the judicial system could be safeguarded during this interim period. It is noted that the drafters authorized the entry of interim orders only in cases where the Board has already filed formal charges and pro-

---

**2.** We addressed this very same issue in *In re Jaffe*, 814 A.2d 308 (Pa.Ct.Jud.Disc.2003) but, because of the high interest in this case, involving, as it does, a Justice of the Supreme Court of this Commonwealth, and because the issue was thoroughly considered and treated in *Jaffe*, rather than simply referring to that case, we will repeat in this opinion large portions of that opinion.

ceedings under § 18(b)(5) are underway, and in cases where a judicial officer has been charged in "an indictment or information [with] a *felony.*" It was in those cases where the drafters perceived the need to provide this Court with the authority for immediate or expeditious suspension in order to avert adverse public perception which may follow if a judicial officer charged with serious offenses continues on the bench or continues on the public payroll.

Courts have debated, and are divided on, the question of whether due process rights are applicable in the judicial disciplinary process. The issue is usually presented as requiring a determination of whether judges have a sufficient property or liberty interest in their offices to invoke the due process clause in disciplinary proceedings, *see, e.g., In re Gillard,* 271 N.W.2d 785 (Minn.1978); *In re Nowell,* 293 N.C. 235, 237 S.E.2d 246 (1977); *In re Hanson,* 532 P.2d 303 (Alaska 1975); *In re Del Rio,* 400 Mich. 665, 256 N.W.2d 727 (1977); *Gruenburg v. Kavanagh,* 413 F.Supp. 1132 (E.D.Mich.1976), as well as the opinion of this Court in *In re Larsen,* 655 A.2d 239, 249 (Pa.Ct.Jud.Disc.1994) where, in support of an interim order of suspension without pay, we noted that

"federal courts have held that state judges do not have a federal constitutional right[3] to hold office," citing *Fink v. Supreme Court of Pennsylvania,* 654 F.Supp. 437 (M.D.Pa.1987), *aff'd,* 838 F.2d 1205 (3rd Cir.1988) and *Gruenburg v. Kavanagh, supra.*

Moreover, once it is decided that a due process property or liberty interest is present there is no consensus as to exactly what sort of due process is due. It has been said that due process of law is not a fixed concept but may vary from situation to situation.[4]

We need not enter these debates in deciding this case, because, in proceedings conducted in this Court "to determine whether a sanction should be imposed," i.e., in proceedings conducted under Article V, § 18(b)(5), there is no occasion to guess or to refer to other cases in deciding whether, and, if so, which, due process rights should be extended to judicial officers against whom formal charges have been filed, for these rights are specifically enumerated in that section.[5] Thus, in this case, Respondent's removal cannot occur, her employment cannot be permanently affected in any way, indeed, no sanction of any kind can be imposed without a full hearing conducted under Article V,

3. The due process analysis is the same under both the United States Constitution and the Pennsylvania Constitution. *See, Electrolux Corp. v. Commonwealth, Dep't of Labor & Industry. Bureau of Employer Tax Operations,* 705 A.2d 1357 (Pa.Cmwlth.1998) citing *Pennsylvania Game Comm'n v. Marich,* 542 Pa. 226, 666 A.2d 253 (1995) (analysis of due process under Federal Constitution is applicable under Pennsylvania Constitution).

4. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *see, also, Oberholzer v. Commission on Judicial Performance,* 20 Cal.4th 371, 84 Cal.Rptr.2d 466, 479, 975 P.2d 663 (1999); *In re Judicial Campaign Complaint Against Carr,* 76 Ohio St.3d 320, 667 N.E.2d 956 (1996).

5. These rights include: the right to a prompt hearing "to determine whether a sanction should be imposed" (this obviously does not refer to interim orders because interim orders have nothing to do with determining whether sanctions should be imposed), the right to a public hearing, conducted pursuant to the Rules of Procedure of this Court, conducted in accordance with due process and in accordance with the law of evidence, the right to discovery and to subpoena witnesses and documents, the right to the presumption of innocence, and the Board has the burden to establish its case by clear and convincing evidence.

§ 18(b)(5) with all its attendant due process protections.

While identification of the principles underlying the drafters' decision to confer these rights on judicial officers may not be important—it is enough that they did confer them—we can assume they include the recognition of a "property" interest in their employment and thus would be in consonance with the holdings of the United States Supreme Court in *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); and *Perry v. Sindermann*, 408 U.S. 593, 602–603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). For example, in *Gilbert* the Supreme Court said:

> The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected "property" interest. . . . we have previously held that public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and *cannot be fired* without due process, . . . . (emphasis added).

*Gilbert v. Homar, supra*, at 928–29, 117 S.Ct. at 1811.

In the instant case, of course, we are not asked to "fire" Respondent, or to take any final or permanent action against her—an interim, temporary suspension only is sought; and we note, as did the United States Supreme Court in the *Gilbert* case that that Court "[has] not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees *short of termination* (emphasis added)." [6] *Id.* at 929,

117 S.Ct. at 1811. Since the point was not contested by the University in *Gilbert*, the Supreme Court decided not to decide it; but "like the District Court assum[e] that the suspension infringed a protected property interest," *Id.* at 929, 117 S.Ct. at 1811. The Court then addressed the question of whether the respondent had "received all the process he was due" in the proceedings leading to his interim suspension. In addressing that precise question in this case we follow the Supreme Court's analysis and conclusion in that case.

The Supreme Court first cited its decision in *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) where it had held that "a public employee dismissible only for cause was entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing." *Gilbert v. Homar, supra*, at 929, 117 S.Ct. at 1811. In *Loudermill* the Court stressed that the pretermination hearing "should be an initial check against mistaken decisions—essentially a determination of whether there are reasonable grounds to believe the charges against the employee are true and support the proposed action." *Loudermill, supra*, at 545–46, 105 S.Ct. 1487.

In the course of its opinion in *Loudermill*, the Supreme Court, in assessing the importance of the governmental interest in the immediate termination of a tenured employee, had observed that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending *with pay*." *Id.* at 544–45, 105 S.Ct. 1487 (emphasis the Supreme Court's).

---

**6.** The employee in that case was a police officer employed by East Stroudsburg University, Pennsylvania.

The Supreme Court, in its opinion in the *Gilbert* case, took note that the lower court in its opinion [7] had

> Rel[ied] on this dictum, which it read as "strongly suggesting that suspension without pay must be preceded by notice and an opportunity to be heard *in all instances,*" 89 F.3d at 1015 (emphasis the Supreme Court's) ... [and] the Court of Appeals adopted a categorical prohibition: "[A] governmental employer may not suspend an employee without pay unless that suspension is preceded by some kind of a pre-suspension hearing, providing the employee with notice and an opportunity to be heard." *Ibid.*[8]

*Gilbert v. Homar, supra,* at 929–930, 117 S.Ct. at 1811. The Supreme Court reversed the Court of Appeals and called its holding on the point "indefensible." *Id.* at 1812. In its opinion the Supreme Court went on to point out that:

> It is by now well established that " 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. [citations omitted]

Indeed, in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), we specifically noted that "we have rejected the proposition that [due process] always requires the State to provide a hearing prior to the initial deprivation of property." 451 U.S. at 540, 101 S.Ct. 1908. And in *FDIC v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 1788, 100 L.Ed.2d 265 (1988), ... we unanimously approved the Federal Deposit Insurance Corporation's suspension, without prior hearing, of an indicted private bank employee,....

*Gilbert v. Homar, supra,* at 930–31, 117 S.Ct. at 1812.

The Supreme Court then described the method to be used "to determine what process is constitutionally due" as requiring the balancing of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct., 893, 47 L.Ed.2d 18 (1976). *See also, e.g., Mallen, supra,* at 242 [108 S.Ct. 1780]; *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

*Id.* at 931–32, 117 S.Ct. at 1812.

Referring to the first factor, the Court recognized the severity of depriving some-

---

**7.** *Homar v. Gilbert,* 89 F.3d 1009 (3d Cir. 1996).

**8.** Of course, in this case, this Respondent has had notice and an opportunity to be heard. In fact, she *has been heard,* presenting her side of the question in several filings with this Court and on two occasions at oral argument—once before a panel of this Court consisting of President Judge Curran, President Judge Emeritus Morris and Judge Clement and the second time before the full Court.

one of the means of his livelihood, but noted:

On the other side of the balance, the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers. Respondent contends that this interest in maintaining public confidence could have been accommodated by suspending him *with* pay until he had a hearing. We think, however, that the government does not have to give an employee charged with a felony a paid leave at taxpayer expense.

*Id.* at 932, 117 S.Ct. at 1813.

Proceeding with this analysis, the Court went on to say:

The last factor in the *Mathews* balancing, and the factor most important to resolution of this case, is the risk of erroneous deprivation and the likely value of any additional procedures .... the purpose of any pre-suspension hearing would be to assure that there are reasonable grounds to support the suspension without pay. Cf. *Mallen*, 486 U.S. at 240, 108 S.Ct. 1780. *But here that has already been assured by the arrest and the filing of charges* (emphasis added).

In *Mallen*, we concluded that an *"ex parte* finding of probable cause" such as a grand jury indictment provides adequate assurance that the suspension is not unjustified. *Id.*, at 240–241 [108 S.Ct. 1780]. The same is true when an employee is arrested and then formally charged with a felony. First, as with an indictment, the arrest and formal charges imposed upon respondent "by an independent body demonstrate that the suspension is not arbitrary." *Id.*, at 244 [108 S.Ct. 1780]. Second, like an indictment, the imposition of felony

charges "itself is an objective fact that will in most cases raise serious public concern." *Id.*, at 244–245 [108 S.Ct. 1780]. It is true, as respondent argues, that there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged; but *for present purposes arrest and charge give reason enough. They serve to assure that the state employer's decision to suspend the employee is not "baseless or unwarranted,"* id., *at 240 [108 S.Ct. 1780], in that an independent third party has determined that there is probable cause to believe the employee committed a serious crime* (emphasis added).

*Id.* at 933–34, 117 S.Ct. at 1813–14.

In *Gilbert,* the charges against respondent were dismissed shortly after he was initially suspended without pay and the Supreme Court marked the importance of that development with the observation that:

Once the charges were dropped, the risk of erroneous deprivation increased substantially, and, ... there was likely value in holding a prompt hearing,....

*Id.* at 935, 117 S.Ct. at 1814.

■ It is useful, in evaluating the factors bearing on the determination of what process is constitutionally due here, to stand the facts of the case presently before us alongside the facts of *Gilbert v. Homar* which were before the United States Supreme Court, In doing so, we find the circumstances of this case provide more support for the entry of an interim order of suspension without pay than do those of *Gilbert v. Homar,* There are several reasons for this:

1. The state's interest in immediately suspending, when felony charges are filed against them, "employees who occupy positions of great public trust and high public

visibility" is of heightened significance, said the Supreme Court in *Gilbert v. Homar, supra,* at 932, 117 S.Ct. at 1813, where the respondent was a police officer. The state's interest here, then, is only more vital: for what employees occupy positions of greater public trust or of higher public visibility than judges?

2. In the case before us a Criminal Information has been filed against Respondent based upon Recommendations made in a Presentment by an Investigating Grand Jury and, In addition, after a two-day preliminary hearing, a judge has found that a *prima facie* case was established by the Commonwealth on seven of the nine charges. In *Gilbert v. Homar,* the respondent was merely arrested and formally charged. There, the Supreme Court acknowledged that: "there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged; but for present purposes arrest and charge give reason enough." *Gilbert v. Homar, supra,* at 934, 117 S.Ct. at 1814.

3. In *Gilbert v. Homar* the charges were dropped—not so, in this case; the criminal prosecution of Respondent goes forward.

4. The post suspension, pre-termination hearing to which this Respondent is entitled under Article V, § 18(b)(5) of our Constitution before any final sanction can be imposed, will provide her with far greater due process protection than that which satisfied the Supreme Court in *Gilbert v. Homar,* i.e., notice of a meeting with his employer and "an opportunity to tell his side of the story." *Id.* at 927, 117 S.Ct. at 1810.

5. The pre-suspension procedures extended to this Respondent include service of the Board Complaint and Petition for Interim Order, representation by counsel, filing of a Response to Per Curiam Order for Hearing on Suspension and Pay Issues, filing of briefs and oral argument in this Court (twice). In *Gilbert v. Homar,* the Respondent was suspended without pay immediately without receiving even notice that there was an intention to do so.

It is our conclusion that the due process accorded Respondent by the Pennsylvania Constitution and provided to her in this case satisfies the requirements of The Due Process Clause of the United States Constitution as well as the Constitution of this Commonwealth.[9]

It should be noted that there has developed in our Commonwealth Court what plausibly could be called a discrete cottage industry in reviewing appeals of public employees who claim they were denied due process in the course of termination of their employment. *See, e.g., Olson v. Borough of Avalon,* 811 A.2d 66 (Pa.Cmwlth. 2002); *Bhattacharjee v. Department of State,* 808 A.2d 280 (Pa.Cmwlth.2002); *Burger v. Board of School Directors of McGuffey School Dist.,* 805 A.2d 663 (Pa. Cmwlth.2002); *Veit v. North Wales Borough,* 800 A.2d 391 (Pa.Cmwlth.2002); *Firman v. Department of State, State Bd. of Medicine,* 697 A.2d 291 (Pa.Cmwlth.1997); *Turner v. Pennsylvania Public Utility Com'n,* 683 A.2d 942 (Pa.Cmwlth.1996); *City of Philadelphia v. Fraternal Order of Police,* 140 Pa.Cmwlth. 235, 592 A.2d 779 (1991); *Shah v. State Bd. of Medicine,* 139 Pa.Cmwlth. 94, 589 A.2d 783 (1991); *Adamovich v. Com., Dept. of Public Welfare,* 95 Pa.Cmwlth. 22, 504 A.2d 952 (1986). In reviewing these cases, the Commonwealth

9. In addition, we note that should future developments establish the deprivation of pay to have been unjustified, this Court has the authority to order the restoration of any pay withheld.

Court's primary inquiry is determining whether the employee received a "Loudermill hearing"—a reference to the Supreme Court's decision in *Cleveland Bd. of Ed. v. Loudermill, supra,* which as earlier pointed out held that "a public employee dismissible only for cause was entitled to a very limited hearing prior to his termination." We are unable to identify any reason why the job status of this public employee entitles her to more due process protection than police officers or school teachers or any other public employee: there is no reason.

We emphasize, moreover that the requirements of *Loudermill* apply to pre-*termination* hearings: we are not here engaged in pre-termination proceedings—these are pre-*suspension* proceedings, conducted pursuant to Article V, § 18(d)(2) "prior to a hearing." The pre-*termination* hearing (conducted pursuant to Article V, § 18(b)(5)) will come later.

In the course of the *Jaffe* opinion, before deciding whether to enter an interim order without pay, we considered it important to review a portion of our earlier opinion in the case of *In re Michael D. Smith,* 712 A.2d 849 (Pa.Ct.Jud.Disc.1998). In *Jaffe* (referring to Smith), we said:

> There we denied a petition for an interim order of suspension with pay, and, in doing so, considered the possible consequence of the language of Article V, § 18(b)(5), regarding the presumption of innocence and the burden of proof required in hearings on formal charges, in proceedings leading to interim orders. In that opinion we said that, since

§ 18(b)(5) provided that "the subject of the charges shall be presumed *innocent in any proceeding* before this Court, and the Board shall have the burden of proving the charges by clear and convincing evidence, we believe that this constitutional abjuration was intended to clothe respondents in interim proceedings such as this with the presumption of innocence, and, although we do not conclude that in these proceedings, the Board's burden should be to persuade this Court by clear and convincing evidence, we do hold that it is the Board's burden to persuade the Court that the totality of the circumstances requires the entry of an interim order of suspension."

*Id.* at 852.

We now affirm our holding in *Smith* that it is the Board's burden to establish that the "totality of the circumstances" requires suspension,[10] but reject the notion that the presumption of innocence extends to respondents in interim proceedings. Respondent has directed our attention to this dictum in *Smith* and calls upon us to accord this Respondent with the presumption of innocence in these interim proceedings. Reconsideration of the issue, which is central in this case, impels us to decline to do so.

Making the presumption of innocence a *sine qua non* in these proceedings would *ipso facto* require a hearing for, in such case, the Board would be compelled to produce some evidence in order to overcome the presumption. This, as we

---

**10.** It probably is more precise to say that this Court needs to be persuaded that "the totality of the circumstances requires suspension"— whether the Board is doing the persuading, or even the asking, is immaterial. Of course we would *prefer* that the Board participate in the process, but we believe the Constitution places the responsibility on this Court of safe-guarding the integrity of the judicial system and the public's confidence therein from the time charges are filed until their final disposition; and it has not made the discharge of that responsibility dependent or conditional upon anybody else doing anything. See n. 1, *supra.*

have said, would contravene the fundamental plan of the Constitution and nullify § 18(d)(2) of Article V which specifically authorizes the entry of temporary, "interim" orders "prior to a hearing," Moreover, a "presumption of innocence," in these interim proceedings, would be incongruous, for, in these interim proceedings we are not to engage in a determination of *guilt v. innocence;* we engage in a determination of whether the totality of the circumstances requires that a judicial officer charged with felonies be suspended with or without pay (footnote omitted).

*In re Jaffe, supra,* at 317–18.

Having decided that this Court is constitutionally authorized to enter an interim order without a hearing and that, in fact, the Constitution contemplates that we do so where appropriate, and that such a procedure does not withhold or offend any due process rights to which Respondent might be entitled, we must decide whether, in our discretion, an interim order suspending Respondent without pay should be entered in this case.

■ In this undertaking, we turn to the rule formulated by this Court in *In re Larsen,* 655 A.2d 239 (Pa.Ct.Jud.Disc.1994) where we stated:

> Rather than a *per se* rule as proposed by the Board, we are of the opinion that a totality of the circumstances test is more appropriate, with each case being decided on its own facts. Among the factors to be considered are the nature of the crime charged, its relation, or lack thereof to the duties of the responding judicial officer, the impact or possible impact on the administration of justice in this Commonwealth, the harm or possible harm to the public confidence in the judiciary as well as any other circumstances relevant to the conduct in question.

*Id.* at 247. *See, also, In re Smith, supra,* at 851–52.

■ Consideration of the annunciated factors leads decisively to the conclusion that the totality of the circumstances in this case calls for the entry of an interim order of suspension without pay.

Counsel for the Respondent contends that suspension without pay is not called for in this case and urges this Court to leave undisturbed our Order of May 22, 2012 suspending Respondent with pay. Counsel makes three arguments on the question:

> The first is a policy argument, *viz.,* that it is the better policy for interim suspensions to be with pay rather than without pay.

> The second is a precedential argument, *viz.,* that the decided cases call for a suspension with pay in this case.

> The third is a factual argument, *viz.,* that the criminal charges are "weak."

■ First, as to the policy argument: Respondent says that the policy which should guide our decision is found in the constitutions, "both federal and state constitutions, is to not challenge the pay of a sitting judge." [11] Respondent also suggests that we must not—or at least should not—suspend without pay because when a public official is impeached he or she continues to be paid until convicted by the Senate.[12] This argument is off-point and unpersuasive, especially when one considers that the Constitution specifically bestows upon this Court the authority to suspend a judge without pay for an interim

---

**11.** Transcript of Proceedings, August 14, 2012, p. 20.

**12.** *Id.*

period; and, indeed, we recognize that the conference of that authority subsumes the *obligation* to do so in a proper case.[13] We think it is better that we look for policy guidance in that part of the Constitution which deals with our function rather than in those parts which don't.

Second, as to the precedential argument: Respondent makes the point that there are more cases—many more—wherein interim suspensions have been imposed with pay rather than without pay. The point is well taken and we acknowledge it; but what it signifies is that this Court has been reluctant to suspend without pay and has been careful to do so only in the most egregious cases—it does not signify anything about what we should do in this case. We decide these cases one by one and we act on the totality of the circumstances as we see it in each case, one by one.[14]

Third, as to the factual argument: Respondent thinks the criminal charges are weak. We happen to think they are strong—and that they describe conduct so egregious as to require Respondent's interim suspension without pay.

■ We hasten to point out that we are not here called upon, nor do we here undertake, to decide whether Respondent actually did the things with which she has been charged, to decide, as it were, the underlying case. Rather, our function here is to ascertain what it is upon which the charges are based in order to determine whether "there are reasonable grounds to support a suspension without

pay" (*Gilbert v. Homar, supra* at 933, 117 S.Ct. at 1813), or, put in slightly different words, "to assure that the state employer's decision to suspend the employee is not 'baseless or unwarranted.'" (*Id.* at 934, 117 S.Ct. at 1814). As we have seen, the United States Supreme Court has held that a mere arrest and charge provide the requisite support for a suspension without pay. *A fortiori,* then, is the requisite support provided here where, in addition to an arrest and charge, there is a Criminal Information based on a Grand Jury Presentment as well as a finding of a *prima facie* case (on seven separate counts) by a judge after a hearing. Thus, three times have "independent third part[ies] . . . determined that there is probable cause to believe the [Respondent] committed a serious crime." (*Id.*)

We will examine now the nature of the Respondent's conduct as described in testimony in the proceedings before the Grand Jury and at the Preliminary Hearing to determine whether it is such that the faithful execution of our constitutional duty requires the entry of an interim order of suspension without pay. In the process we will necessarily be expressing our view on whether the evidence presented in support of the charges is "weak" as counsel so persistently insists it is.

We think it is fair to say that the reason (or at least the main reason) that counsel makes that argument is because he asserts that Respondent had no knowledge—no knowledge whatsoever—that any of her employees working in her office in the

---

**13.** We think it is obvious that the drafters considered that it was certainly a possibility that a case might come along where the preservation of citizens' confidence in their judicial system could only be assured by suspension without pay—that suspension with pay wouldn't do it—and so they included the "without pay" provision in the Constitution.

**14.** So long as we are talking about precedent, we mention that the most recent interim order of suspension was entered this year by the Supreme Court in *In re: Philadelphia Traffic Court Judge Willie Singletary,* No. 377 Judicial Admin. Dkt. (January 5, 2012). In that case the suspension was ordered without a hearing, without pay, and the Respondent in that case was not charged with any crime.

Superior Court—her secretaries and law clerks and including her own sister, Janine Orie, who was the officer manager—were engaging in illegal, forbidden [15] political activities over the course of two full years: 2003 and 2009. Counsel makes similar assertions about Respondent's lack of knowledge that any of the employees of another sister, former Senator Jane Orie, working in her senatorial office, were engaging in extensive political activities in assisting in Respondent's campaigns for Supreme Court in the same two election years. As a matter of fact, counsel challenged the Board to "to point to any place in the transcript" [16] where evidence could be found which would establish otherwise. We have accepted that challenge and have reviewed the Notes of Testimony of the Preliminary Hearing; and we found a record brimming with evidence establishing "otherwise."

We refer to a few examples:

Lisa Sasinoski (Respondent's chief law clerk) testified that she drove Respondent all around the state to political events both during and after working hours. At these events which included "meets and greets" at law firms, courthouse "walk-throughs," visits to local radio stations, fundraisers, party caucuses, and dinners, she would work with Respondent in handing out "handcards," brochures and the like, all of political content, and sometimes she would pass around nominating petitions for signatures. On those trips, Respondent and Lisa Sasinoski commonly discussed speeches that Lisa Sasinoski had written or helped write for Respondent. (N.T. 140–43, 148–51, Day 1).

We think it is likely that the Commonwealth will be able to establish:

— that Respondent knew it was Lisa Sasinoski who was driving the car,

— that Respondent knew that it was Lisa Sasinoski who was helping her at the political events,

— that Respondent knew who Lisa Sasinoski was and knew that she worked for her in her Superior Court office,

— that Respondent knew that Lisa Sasinoski was paid by the Superior Court,

— that Respondent knew that Lisa Sasinoski was not paid by her or by the "Joan Orie Melvin Campaign,"

— that Respondent knew that Lisa Sasinoski was prohibited from engaging in any "partisan political activity" by an Order of the Supreme Court,[17]

— that Respondent knew that Lisa Sasinoski was violating that Order because she knew Lisa Sasinoski was a court-appointed employee and was engaging in partisan political activity on Respondent's behalf,

— that Respondent knew that she was prohibited from diverting the services of Lisa Sasinoski for her own benefit by Section 3926(b) of the Pennsylvania Crimes Code which designated the crime as a felony.

Lisa Sasinoski also testified that after the 2003 election, which Respondent did not win, she walked into Respondent's office:

A. and I said, I can't do this any-more—it was after the election—I

---

**15.** Forbidden by the Order of the Supreme Court of Pennsylvania in *In re: Prohibited Political Activity by Court–Appointed Employees*, 201 Judicial Admin. Dkt. 1 (1998).

**16.** See Transcript of Proceeding, August 14, 2012, pp. 30–31.

**17.** See n. 15, *supra*.

said, I can't do this anymore, I can't do the up and down the high anymore, I can't—it's taken a tremendous toll on myself. I was suffering from migraines, and I was not a professional fundraiser, I was not a professional politician or someone that ran campaigns, and I said this has got to stop. When I said that, she turned to me and said, Lisa, we need to kick it up a notch.

Q. Who said that?

A. Joan Orie Melvin.

Q. Meaning what to you?

A. That I wasn't working hard enough and it had not turned out well. If I had worked harder, she would have won.

Q. Meaning the election; is that correct?

A. Yes.

Q. And then what happened?

A. The phone rang, she turned to answer it. Janine was standing behind me. I felt intimidated by that. I got up and walked into my office.

Q. And then what happened?

A. I came to work for the next two days—this happened on a Monday. By Wednesday afternoon Janine came into my office and she said, I need your building ID and I need your court ID. I said, why? She said, you need to talk to Joan about that. And she turned around and walked out.

I knew what it was. I knew they had fired me, but I didn't realize that they had taken me off the payroll on Monday. (N.T. 187–89, Day 1).

Barbara Brown, Jason Davidek and Sharon Cochran all testified that they drove Respondent to political events (Brown and Davidek extensively, Cochran on one occasion) and that at those events they did the same sort of things as Sasino-

ski was doing. (N.T. 165, Day 1, Cochran; N.T. 143, Day 2, Brown; N.T. 190 Day 2, Davidek). We think it is likely that the Commonwealth will be able to establish that Respondent knew who these people were and that they were employed by and paid by the Senate of Pennsylvania, and that they worked for her sister, then Senator Jane Orie, and were not paid by Respondent or by Respondent's campaign and that Respondent knew that by diverting their services to her own benefit she was violating the same law as in the case of Sasinoski.

Sharon Cochran testified that the event to which she drove Respondent was an affair of Local 119 of the Steelworkers' Union of which her ex-husband was a member, that she was directed to get her husband to put together a rally and have Joan address the Steelworkers, that the day before she inquired of her immediate supervisor, Jamie Pavlot, then Senator Jane Orie's chief of staff, whether the Steelworkers' event was still on the schedule and was advised by Pavlot that it was and that "The Judge would love to have you attend." (N.T. 269–72, Day 1). Cochran further testified that she did attend the meeting which was poorly attended and when she came to work at the Senator's office the next morning waiting for her was a "scathing e-mail" from the Senator (who had not attended the Steelworkers' meeting) who "was livid about the poor attendance and that I hadn't—that my husband and I had not done a better job in preparing for the event and it was basically a waste of her sister's time." (N.T. 273–74, Day 1).

Barbara Brown also testified as follows:

Q. What other jobs or tasks did the Judge give you regarding Judge Baer, if any?

A. As I recall, she had e-mailed me on an occasion and asked that I do some

research into his campaign expenses, Janine wasn't available to do so. The records were offsite.

Q. And she asked you?

A. The Judge had asked me if I could please do this research and break the monies down, total campaign monies. And she gave further instruction in the e-mail.

[Witness is shown Exhibit 25.]

Q. And I would ask the witness if you recognize this e-mail. Do you recognize that document, Miss Brown?

Q. And is it related to any of the testimony that you have just given?

A. Yes.

Q. And what was that?

A. This would be the e-mail I just referred to where the Judge had asked me to do some research for her on Max Baer's finance report, campaign finance reports.

Q. Did you complete the tasks as laid out in this e-mail?

A. To my memory, yes, I did.

Q. And to your memory, who did you report the results to?

A. I sent them back. I feel confident that I sent them back to the Judge as she requested.

Q. And if you could, Ms. Brown, can you go through that e-mail and not read it, but tell us what exactly you were instructed to do?

A. Compile from Max Baer's campaign reports the total monies that he collected, the total monies he spent, and also the total in kind contributions. And of the total, how much of it was family money. Ascertain that. And apply the expenses for staff. They were my notes. What I got out of the e-mail to do.

Q. And what e-mail address does this originate from?

A. It came from the Judge's yahoo account.

Q. And do you recognize that address?

A. Yes.

Q. Would you use it on occasion?

A. Yes.

Q. To contact who?

A. The Judge.

Q. And in your experience, would the Judge receive the messages?

A. Yes.

Q. There is a sent day of the week and time. Do you see where I mean on the second line?

A. Yes.

Q. What day of the week was this sent to you?

A. Tuesday, February 3, 2004, at 2:43 p.m.

Q. Are those business hours?

A. Yes.

Q. Did you put this aside to work on later, or did you work on it in the office?

A. Again, as I recall, because it was the Judge, I began working on it right away.

Q. Was that your policy?

A. Yes.

Q. Why?

A. The Senator stated more than once that Joan was a priority.

Mr. Casey: I'm sorry. I can't hear the witness.

The Court: If you could speak up a little bit.

Mr. Becker: Try to speak up a little bit, ma'am.

A. **The Senator indicated on several occasions that Joan was a priority. Anything for Joan. She was a priori-**

ty. **I felt this was a priority at that time.**

Q. The text of the message mentions Janine. What was her role in this subject?

A. In this subject, the Judge conveyed to me that she asked Janine if she could, but Janine had sent all of their records offsite for storage and it would take some time. Therefore, she was asking me if I could do it.

Q. How much time did you spend on the tasks outlined in this e-mail, if you know?

A. Honestly, I don't remember.

Q. Do you remember how much time you spent working on the campaign of the Judge during 2003?

A. It was quite a bit.

Q. Can you estimate it for us perhaps using a percentage?

A. I would ballpark say 40 percent.

Q. Forty percent. I want to limit your answer to the workday and the time that you spent away from work. How much time would you say percentage wise you spent doing campaign work that otherwise would have been legislative time and you were being paid by the legislature?

A. Averaging ballpark, I would still guess 40 percent.

Q. Did you ever receive any other correspondence from the Judge separate and apart from telephone calls and e-mails that you already testified to in hard copy, let's say?

A. Yes. The Judge after the campaign wrote me a very nice thank you letter.

Mr. Becker: Can I approach the witness and what I'm marking as Commonwealth's Exhibit 26.

The Court: Yes.

Mr. Becker:

Q. I ask you, Miss Brown, if you recognize that Exhibit?

A. Yes.

Q. How do you recognize it? What is it?

A. This was a nice thank you letter that the Judge sent me after the conclusion of the campaign. Even though she had lost, she did appreciate my assistance throughout the year.

Mr. Becker: And the body of the letter is short. With the Court's indulgence, I would ask the witness to read it.

The Court: Go ahead.

A. You would like me to read the letter?

Q. Please.

A. My parents instilled in me the real meaning of achievement. Working your hardest and giving the best in your efforts. Ralph Waldo Emerson said, every great achievement is the victory of a flaming heart. Throughout my life, I have also aimed for achievement. While the elections results were adverse, our flaming hearts have achieved. My is on mutual effort.

This past year has been a rewarding experience because I shared it with you. You have touched my heart through your support and friendship. I've truly enjoyed the journey as it was an enriching one for me. May God bless you. Joan Orie Melvin.

Q. And it's signed by?

A. Joan Orie Melvin.

Q. On receiving the correspondence, did it make sense to you?

A. Yes.

Q. What would you say the Justice was thanking you for?

A. For my work on her campaign throughout the year. (N.T. 154–62, Day 2).

Jamie Pavlot testified about her role in obtaining an endorsement for Respondent from some Veterans' organization. She was shown Exhibit 32 and her testimony was:

Q. What is that, please?

A. This is regarding a Veteran endorsement.

Q. It appears that the subject matter here involves what topic? What is the subject?

A. Obtaining a Veterans organization endorsement on behalf of Judge Joan Orie Melvin.

Q. And if one were to start at the bottom, which it appears that would be the first in time, who actually originated this e-mail thread by corresponding with you?

A. Judge Melvin did.

Q. And what is it that the subject was on the subject line?

A. Veteran endorsement.

Q. And what was the message that you received?

A. I need an endorsement from a Veterans group ASAP. Panella got one for Allegheny County. I need one to put up on my website ASAP. Thanks.

Q. And did you respond to that?

A. I did.

Q. And if you notice the "from" is your name, is that correct, as we move up the page?

A. Yes.

Q. Who is the "to?"

A. It says mom, but it's Judge Joan Orie Melvin.

Q. You know that?

A. Yes.

Q. What was it that you said to Joan Orie Melvin regarding the Veteran endorsement?

A. I said that Ron said you can use him and say anything. He will make calls to Ralph Usack, a boxer and Lois someone. And get back to me by 1:00 p.m. today.

Q. And was there then a follow-up response to you, as we move up that page?

A. Yes; from the Judge to me. And it said, what organization can I say for Ron.

Q. And what was she asking you?

A. What organization can I use as an endorsement from the Veterans. Whose name. Who can I use. What can I say for Ron.

Q. And what did you respond to her?

A. I responded with Soldiers and Sailors and also called West View VFW in Etna. Waiting return call from them.

Q. And the response to you in regard to your message was what?

A. Thank you very much. (N.T. 273–75, Day 2).

Jamie Pavlot also testified about a stream of eight e-mails over the course of one afternoon (September 21, 2009) between her and the Respondent about arrangements for a "Gun Bash" being held by "The Sportsmen's Association." These e-mails are contained in Exhibit 31 which consists of three pages. The e-mails begin with Pavlot advising Respondent that, inasmuch as "the Senator" had donated $100.00 to the Sportsmen's Association and 500–800 attendees were expected at the Bash, it would be a good idea for her to "send about 500 poll cards so they can set them out," followed by inquiry by the Respondent asking "Who do I give them to? Will Josh be going?" (Josh is Josh Dott, another employee of Senator Orie's), then

Pavlot's advice to the Respondent that, yes, she could "send" Josh. Josh apparently did go with plenty of poll cards because in the final e-mail the Respondent expressed her appreciation to all those on Pavlot's staff, i.e., the Senator's staff, for all their help as follows: "Thank you guys. You are AWESOME"

Lisa Sasinoski testified that one day near the end of the 2003 campaign she was ordered by Janine to help the campaign get some "street money." Her testimony was:

Q. During the period of time of the 2003 campaign cycle, did you express your reservations about doing political work to anyone?

A. Well, it was very difficult to say anything when it was something simply as do the work at home that you have to do during the day and just come with me now. I was made to feel that it was very minor of what I was doing, so that if my whole evening was taken up doing something else, well, this is all for the greater good.

But when it finally came to a head and I was asked to do something, I just couldn't do it.

Q. Would you describe what that occasion or incident was please?

A. Janine walked into my office before the campaign was over—I can't tell you a day of when it was—but she had a stack of papers with her, and she said, I need you to help me get some street money.

Q. Who said that to you?

A. Janine.

Q. What is street money?

A. My understanding was that they wanted cash to come out of the campaign, and the only way to do it—it's illegal to take cash out of a campaign, so you would have to submit a voucher for an expense. If you made up a voucher and submitted it and cashed it, then you would get the cash.

For example, if you were going to buy yard signs, you would write a check to a company for yard signs. But if you wanted to get cash out of the campaign, you could write a check for yard signs and somehow convince the person you were giving it to to cash it. And so that's not easily done. People don't help and do things like that.

So what they wanted me to do was to make up vouchers that Jane had traveled wherever I had gone, duplicate—so if I was in a hotel room, there would be a second one for Jane, and then that would create expenses. They would write a check to Jane. Jane, being her sister, would cash it and you could trust her to turn the cash back over to the campaign.

Q. How would you characterize such a document had you prepared it?

A. It would be an expense voucher, or it would be part of the campaign expenses.

Q. And then it would have been submitted and processed?

A. Yes, sent to the accountant who was the treasurer, and it would be handled routinely as any other campaign expenses would have been.

Q. What was your reaction upon being asked to do this?

A. I remember it vividly. It was about a quarter to twelve and I said, I have to go out to lunch. I promised I would go out to lunch, and so I'll handle this when I come back, and I walked out of the office.

Q. What, if anything, did you do about complying with that request?

A. I tried to ignore it, and about two or three days went by and Janine came in and she said, never mind, and she picked them all up and walked out.

Q. To your knowledge, you did not participate in that at all then?

A. No, I did not. I was an attorney who had gone to law school, had taken the Bar exam, and there was absolutely no way that I was going to duplicate or fabricate or whatever you want to call it, make up an expense voucher to take money out of the campaign that I knew to be wholly illegal.

Driving up and down the highway was one thing, but making up expense vouchers to steal money out of the campaign was just not something that I was willing to do.

Q. And just so the record is clear, who was it that asked you to do this?

A. Janine asked me to do it, but she had shown me all of the expenses that were the Judge's expenses, and she would have only had those had she— she had to get them from the Judge, so it was my understanding that the Judge was completely aware of what was going on. (N.T. 169–72, Day 1).

Molly Creenan was employed as a law clerk by the Superior Court working for Respondent in her judicial office during her 2003 and 2009 campaigns for the Supreme Court. In her testimony she spoke of a meeting she had with Respondent in December of 2008 upon the occasion of learning that Respondent was planning to run again in 2009. She testified as follows:

Q. Let's move ahead to the year 2008, specifically in December.

A. Yes.

Q. Do you remember having a conversation with then Judge Joan Orie Melvin about anything of a political nature?

A. Yes.

Q. Would you describe to the Court when that conversation occurred?

A. Yes. I believe it took place on December 17th or 18th of 2008.

Q. Where did it take place?

A. It took place in the chambers in her office.

Q. And what was the nature of the conversation, if you recall?

A. I had learned shortly before that that the Judge had decided to run for the Supreme Court. I had some concerns about her decision to run and how it would affect the office. I spoke to the chief law clerk, Jack Degener, and the deputy law clerk, Cathy Skidmore, about my concerns, because I didn't want the staff to be asked to do what they were asked to do in 2003 in 2009.

Q. Well, let me ask for you to reiterate what is it that you saw being done that caused you to have that concern with the Judge?

A. The main concern was having the staff being asked to work a poll, the type of activity that Janine was doing in the office, and the work on the questionnaires.

Q. What were the three things? I believe you said Janine's work that she was doing?

A. I was concerned about Janine remaining in the office and doing campaign work if the Judge was running in 2009.

Q. Had you ever been asked to fax any of the materials that you had prepared to anyone else, the political work?

A. In 2003 I was, yes.

Q. And what was that please?

A. In 2003 I received a phone call from Senator Orie. She had informed me

that a certain questionnaire was due and needed to be faxed to a particular interest group. It was either a pro-life or a pro-choice interest group. I told her that I would not fax the questionnaire, I would not use the Superior Court fax machine for that purpose.

Senator Orie began screaming at me and yelling at me and telling me that I had to fax the questionnaire. I didn't know what to do. It was later—it was after work hours when this call happened, and Cathy Skidmore was still in the office.

Q. Let me interrupt for a moment please. You said you didn't know what to do. Why is that? Would you explain that?

A. Well, because I didn't want to use the court's equipment for a campaign related matter, so—

Q. Did that cause you stress or concern?

A. Very much.

Q. Please continue.

A. I consulted with Cathy Skidmore who was there at the same time as me in the office. We were both judicial law clerks at that time. We decided that the best thing to do was not fax it from the court's fax machine, but to go next-door to the Kinko's and fax it from there, and that's what I did.

Q. That's what you did?

A. Yes.

Q. And it was concerns like that that brought you to meet with Judge Joan Orie Melvin in that December meeting that you just described: correct?

A. That was one of the concerns. Also, too, at that time the staffers in the office were Jack Degener was the

chief law clerk, I was a deputy, Cathy Skidmore was a deputy, and Bob Woods was just a judicial law clerk. Lisa Sasinoski wasn't there at the time.

In 2003 Lisa did travel with the judge on political related events. I didn't want that to happen in the office in 2009 either.

Q. What did you say to the Judge, ma'am?

A. Well, I met with the Judge. I believe Janine walked me into the Judge's office. I congratulated the judge on her decision to run for the Pennsylvania Supreme Court. I told her I had concerns, though, about her running. I told her what happened in 2003 cannot happen in 2009. I told her that the Superior Court equipment, the computers, and the printers and copiers cannot be used for political purposes.

I told her that when Judge Todd ran for the Supreme Court, her secretary took a leave of absence. I indicated to her that if she wanted Janine to help her with the campaign, that Janine should take a leave of absence.

I told her that I had concerns about the Habay conviction and the Bonusgate investigations that were going on at that time. I believed that both of those instances and those matters would result in our office being under a lot of scrutiny if she was deciding to run for the Supreme Court. As a result, I told her that I would not assist her in completing any political questionnaires.

She asked me if I would do those questionnaires or draft them on my own time.[18] I said no. I said if

18. This is an incongruous and unlikely response from somebody who *did not know* that

Molly Creenan had been doing political work—as a matter of fact, it tends to show

there's ever an investigation into our office, I would tell the truth, and that was our conversation.

Q. What, if any, response did you get at the conclusion of that conversation?

A. I didn't really get a response.

Q. Did anyone else to your knowledge overhear your conversation and that of then Judge Joan Orie Melvin?

A. I believe Janine was in and out of the office at the time I had that conversation with her. I had also told Cathy Skidmore and Jack Degener that I intended to speak with the Justice. I asked them to come with me to speak with her, but they would not come with me. (N.T. 21–27, Day 1).[19]

Molly Creenan then testified that despite her pleas to the Judge, Janine did not take a leave of absence but continued with political work in the 2009 campaign as did Kathy Squires and Jack Degener. She testified that:

A. Janine and the Judge still wanted me to complete questionnaires.

*　*　*　*　*　*

Q. Did you ever get any particular indication that the then judge, your boss, knew that you were refusing to do these things?

A. Yes.

Q. And how did that occur?

*　*　*　*　*　*

that Respondent *did know*. It shows that Respondent knew Molly was working during regular working hours (to which Molly was now objecting) so Respondent asked if she objected to doing it *after* hours. If Respondent *did not know* that Molly Creenan had been doing any political work, she would have been surprised (shocked? horrified?) to hear that she had, and would have reacted accordingly, as: "What do you mean you were doing work for my campaign on state time?! In my judicial office?! I could get in trouble!"

A. There was one occasion when I did not complete a questionnaire and the Judge faxed back the cover sheet of the questionnaire and on the top of it wrote "are you above this?" (N.T. 27–29, Day 1).

In addition to the above examples, we think it is likely true, and likely to be established by the Commonwealth, that Respondent, Joan Orie Melvin, knew that her sister, Janine Orie, was employed by the Superior Court in 2003 and 2009 and that despite that, she, Janine, was working extensively on Respondent's political campaigns in those years. The extent of Janine's involvement in those campaigns was described by the others who worked with her every day during those campaigns. For example:

Creenan:

Q. Would you describe to the Court what things Janine did, please, of a political nature?

A. Well, Janine would be fielding calls most of the day from Senator Orie and her staff. She would be making—I would see her making copies and printing things out of the printer that were of a political nature.

Q. The things that you saw Janine do, was there any particular part of the day that she would have done this during the election cycle of '03?

19. In the Presentment C–2, pp. 27–28 (Board Exhibit A of Board Complaint), the Grand Jury reported that Degener acknowledged that Molly Creenan approached him about the law clerks meeting with the Judge regarding the political activity of the staff but that Degener was of the opinion that the message Molly was proposing to deliver to Respondent would "not resonate" with her.

A. None in particular. I mean, it would be during the day.

Q. And how much of her time to your knowledge was being devoted to this let's say between the time period of the primary election up through and including the general?

A. I don't know if I can quantify the time. I wasn't her supervisor. I didn't review what she did or didn't do. I worked on my own caseload and my workload, but I would see her doing things on a regular basis in the office.

Q. On a regular basis you say?

A. Yes.

Q. How would you describe regular please?

A. On a daily basis.

Q. Daily basis. For more than less a small amount of her day?

A. More. (N.T. 18–19, Day 1).

Sasinoski:

A. Janine was the campaign manager. She was the face of the campaign. Janine was the one that you would get direction from, and I was right across the hall from the Judge in my office, and she knew well what I was doing.

Q. If Janine was the campaign manager as you describe her, where was the campaign office in which she was working?

A. It was our office. There was no campaign office, (N.T. 175, Day 1),

Sasinoski again:

A. As the campaign heated up, there were days that is all I did, working on campaign things getting closer to the election.

Q. My question went to observations of Janine.

A. Oh, Janine.

Q. Yes.

A. It seemed to me that's all she did. I would say Janine was 80, 90 percent of the day working on the campaign. (N.T. 191–92, Day 1).

Squires:

Q. How would you characterize the political job that Janine Orie did in your office?

Q. Can you describe a characterization of Janine regarding Joan Orie Melvin's campaign?

A. I thought she was, like, a campaign manager.

Q. Why would you think that?

A. Because she spent a lot of time and effort working on the campaign.

Q. Again, that was at what location, please, that she was doing this?

A. At our chambers. (N.T. 313–14, Day 1).

We believe it is equally likely true and equally likely that the Commonwealth will establish that Respondent, Joan Orie Melvin, knew that her sister, then Senator Jane Orie, was employed by the Senate of Pennsylvania in 2003 and 2009 and that, despite that, she, then Senator Jane, was working extensively on Respondent's political campaigns in 2003 and 2009.

Finally, we point out that Respondent is charged (in Charge designated B.) with conspiring with her sisters Janine and Jane to divert the services of her judicial staff and the services of Jane's senatorial staff, in order to facilitate and promote Respondent's election campaigns of 2003 and 2009. The actual diversion of services charges are made in Charge designated A. Count 2 (Respondent's judicial staff) and Count 3 (Jane's senatorial staff). (Finding of Fact No. 10, *supra*, at pp. 3–4.)

■ It is the well established law of Pennsylvania that the acts and declarations of a co-conspirator in furtherance of

the conspiracy are admissible against an accused. Thus, following that law, in ordering the joinder of Janine's criminal case with this Respondent's, Honorable Jeffrey A. Manning of the Court of Common Pleas of Allegheny County held:

> Because the defendant Melvin is charged with conspiring with defendant Orie, if there is at least *prima facie* proof of the conspiracy alleged by the prosecution, then the acts and declarations of Janine Orie done pursuant to or in furtherance of the conspiracy's purpose are admissible in evidence against defendant Melvin [citing *Commonwealth v. Cimorose*, 330 Pa.Super. 1, 478 A.2d 1318, 1324 (1984)].
>
> Accordingly, if at trial there is *prima facie* evidence of the conspiracy charged, then evidence of any acts committed by either of defendant Melvin's co-conspirators, defendant Janine Orie or Jane Orie, would be admissible against defendant Melvin.
>
> \*   \*   \*   \*   \*   \*
>
> Defendant Melvin, at count 3, is charged with theft of services ... based on the same factual allegation that the services of members of Jane Orie's staff were diverted for the benefit of defendant Melvin. Defendant Orie and Jane Orie are identified as defendant Melvin's accomplices in committing this offense. Evidence that would be offered to prove the elements of the theft and conspiracy counts charged against defendant Orie would also be relevant to the same charges against defendant Melvin. They involve the same acts and the same conspiratorial agreement.

*Commonwealth v. Joan Orie Melvin.*, No. CC: 201202447, *Commonwealth v. Janine Orie*, Nos. CC: 201010286 & 201115981, slip op at 5–7 (C.P. Allegheny County, Pa., Criminal Division, 2012).[20]

Thus, should evidence tending to establish, *prima facie*, the existence of a conspiracy among this Respondent and her sisters, Jane and Janine, to divert the services of persons employed in Joan's judicial office and Jane's senatorial office for the personal benefit of Respondent, be presented at Respondent's criminal trial—as it was at the Preliminary Hearing—then every act and every declaration made by Jane or Janine in furtherance of the common purpose will be admissible against Respondent. And this is so whether or not Respondent knew what was being said or done by Jane or Janine in furtherance

---

**20.** It would follow that the acts or declarations of Janine and Jane in furtherance of the conspiracy to steal services in order to get Joan elected to the Supreme Court (if *prima facie* evidence of the conspiracy is introduced) would be admissible against Joan in connection with the other charges. *See, e.g.*, Judge Manning's opinion where he stated:

> In *Commonwealth v. Evans*, 489 Pa. 85, 413 A.2d 1025, 1028 (1980), the Pennsylvania State Supreme Court stated:
> "The declarations or acts of one conspirator made to third parties in the absence of his coconspirator are admissible in evidence against both provided that such declarations or acts were made during the conspiracy and in furtherance of the common design."

quoting *Commonwealth v. Porter*, 449 Pa. 153, 161, 295 A.2d 311, 314 (1972); *Commonwealth v. Ellsworth*, 409 Pa. 505, 509, 187 A.2d 640, 642 (1963). The alleged acts of defendant Orie in attempting to destroy or conceal evidence of the conspiracy to divert services is likely to be admissible against the defendant Melvin as those acts, if they are proven to have occurred, were arguably made in furtherance of the common design of the alleged underlying conspiracy. Certainly, the concealment of the documents that would constitute direct evidence of existence of the conspiracy would further the common design of this conspiracy: the diversion of the services of public employees to the private interest of the defendants.

*Id.* at 8–9

of the common purpose. However that may be, we cannot leave this subject without mentioning that assertions that this Respondent did not know what her sisters were saying and doing and, for that matter, what her staff and her sister's staff were doing, test the patience of the Court.

We look now at the totality of the circumstances in this case.

Certainly, whether the charges against the Respondent allege crimes, and whether those crimes are felonies is important, as it would be important in the public's view of this case.[21]

Whether the conduct giving rise to the charges is related to the duties of this Respondent is also a factor to be considered.[22] Certainly, Respondent's relationship with her judicial staff—her law clerks and her secretaries—and her supervision of them is integral to the everyday business of her office and the business of the Superior Court.

But, in this case, what drives our decision is the nature and quality of Respondent's conduct. In examining that conduct we see this Respondent as so single-mindedly occupied with achieving personal aggrandizement that she pressured, intimidated and bullied her clerks and secretaries into performing work on her political campaigns in violation of a pledge each had made as a condition of their employment pursuant to an Order of the Supreme Court of Pennsylvania. This intimidation and bullying was relentless and continued over long periods of time. Her chief clerk, Molly Creenan, practically begged her to stop demanding that the staff continue to violate the Order prohibiting them from engaging in such political activity; but Respondent didn't stop. Molly Creenan continued to get political

assignments and when she refused to disobey the Supreme Court's Order, Respondent mocked her with a note asking "Are you above this?" This intimidation was backed up by loss of favor [of the boss and her deputy-sister], and discharge—and fear thereof. Respondent's judicial staffers were confronted with the prototypical "Hobson's choice": their choice was either *obey* Respondent's commands and risk being fired by the Supreme Court, or *disobey* her commands and risk being fired by her.

Respondent persisted with this treatment of her staff into 2009 when the so-called "Bonusgate" investigations were well underway and public officials were being convicted and were going to prison for theft of services—for the very same conduct for which this Respondent is charged. These were very public events and when viewed with that in mind, Respondent's continued disregard for the law can modestly be described as spectacular.

In these circumstances only an order of interim suspension which removes this Respondent from the public payroll has any prospect of ameliorating the harm to the public's confidence in the judicial system which has been caused by Respondent's conduct which has led to the pending charges against her.

Evaluation of the factors designated for consideration in *Larsen* and *Jaffe* leads to the conclusion that the totality of the circumstances calls for an order of suspension without pay.

## IV. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of the Petition for Relief

---

**21.** *In re Larsen,* 655 A.2d 239 (Pa.Ct.Jud.Disc. 1994).

**22.** *Id.*

Requesting Interim Suspension Without Pay pursuant to Article V, § 18(d)(2) of the Pennsylvania Constitution.

2. The totality of the circumstances of this case requires that the Judicial Conduct Board's Petition be granted.

3. An interim order will be entered suspending Respondent without pay until further Order of this Court.

Judge McGINLEY dissents and would leave in place this Court's Order of May 22, 2012 suspending Respondent with pay.

Judge JAMES and Judge MULLEN did not participate in the consideration or disposition of this case.