

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-21-1997

# USA v. Cross

Precedential or Non-Precedential:

Docket
96-3239,96-3240,96-3241

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"USA v. Cross" (1997). *1997 Decisions.* Paper 245.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/245

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 21, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-3239, 96-3240, 96-3241

UNITED STATES OF AMERICA

v.

WALTER V. CROSS, a/k/a Bobo
Appellant in No. 96-3239

JULES C. MELOGRANE
Appellant in No. 96-3240

NUNZIO MELOGRANE
Appellant in No. 96-3241

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Crim. Action Nos. 94-cr-00233-1, 94-cr-00233-2,
and 94-cr-00233-3)

Argued: August 12, 1997

BEFORE: STAPLETON, GREENBERG and COWEN,
Circuit Judges

(Opinion Filed October 21, 1997)

Philip A. Ignelzi (Argued)
Samuel J. Cordes
Michael A. Murphy
Ogg, Jones, Cordes & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222
Attorneys for Appellant
 in No. 96-3239


J. Alan Johnson
Swensen, Peror & Johnson
Two PNC Plaza
Suite 2710
Pittsburgh, PA 15222
Attorney for Appellant
 in No. 96-3240

Kevin G. Sasinoski

2510 Lawyers Building
Pittsburgh, PA 15219
Attorney for Appellant
 in No. 96-3241

Frederick W. Thieman
U.S. Attorney
Paul J. Brysh (Argued)
Assistant U.S. Attorney
Office of United States Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219
Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

A jury in the U.S. District Court for the Western District of Pennsylvania found Appellants Walter Cross, Jules Melograne, and Nunzio Melograne guilty of one count each of conspiracy to deprive Pennsylvania residents of their civil right to fair and impartial trial, 18 U.S.C. S 241, and conspiracy to commit mail fraud, 18 U.S.C. SS 371 and 1341. All three defendants appeal both convictions. They assert that the civil rights conviction is based on a vague and undefined theory that cannot support a criminal conviction, and that the only mailings involved were not sufficiently connected to the fraudulent scheme to bring it within the federal mail fraud statute. We hold that established precedent provided clear notice to the defendants that their agreement would constitute a conspiracy to violate a civil right of the victims of that

2

agreement; therefore, we affirm the convictions for conspiracy to violate civil rights. We reverse the mail fraud conspiracy conviction, however, because none of the mailings contemplated in the conspiracy was undertaken "for the purpose of executing" the scheme to defraud Pennsylvania and its citizens of honest government services.

I. Background

From December 1990 through July 1993, Cross and the Melogranes conspired to "fix" cases coming before the Statutory Appeals Division of the Court of Common Pleas of Allegheny County, Pennsylvania (the "Statutory Appeals Court"). In statutory appeals, the court exercises de novo review of the decisions of courts of the "minor judiciary" on

matters such as traffic offenses and municipal ordinance violations. Jules Melograne was a District Justice who presided over one of the courts of the minor judiciary. Cross was the supervisor of the Statutory Appeals Court in Allegheny County, where he performed a number of duties, including (1) determining when defendants, attorneys, and witnesses (most often police officers) were present to begin hearings, (2) controlling the order of hearings, (3) handling requests for postponements, and (4) signing pay vouchers for police officers who had appeared as witnesses. Nunzio Melograne was the "tipstaff" for the judge assigned to hear statutory appeals. He kept the court calendar, maintained the case files, called the cases, and swore the witnesses.

Viewing the evidence at trial in the light most favorable to the government, the record indicates that Cross and the Melogranes conspired to influence the decisions of the court in a variety of ways. Most frequently, they would utilize their authority and access to the decision maker to assure resolution of the case in the defendants' favor. Cross repeatedly procured the absence of police officer witnesses at hearings by telling them that they were not needed, asking them to leave, or by calling the hearings early, before the police witnesses had arrived. These tactics led to automatic not-guilty verdicts. See Pa. R. Crim. P. 86(f). Cross asked the judge not to rule on certain cases during the hearing, but to take them under advisement, or "c.a.v."

After the hearings had concluded, Cross and Nunzio Melograne would accompany the judge to his chambers with the c.a.v. cases, and after fifteen to twenty minutes they would emerge with several not-guilty verdicts. FBI surveillance also recorded Cross discussing defendants being found not guilty "because Jules wants it," App. at 929, presumably referring to Jules Melograne. Witnesses reported that they had observed stars, check marks, or "c.a.v." notations by defendants' names on Cross's trial calendar before they had appeared; such defendants normally were found not guilty or received reduced sentences at their hearings. In addition, Cross was observed accepting food, tickets to sporting events, fruit baskets, and other items despite his office's policy against employees accepting gifts. Witnesses testified that the gifts had been offered in exchange for promises by Cross to reduce or eliminate citations and to influence hearings.

On other occasions, Cross and the Melogranes would work to assure that a case would be decided against the defendant--as the government called them, the "to be found guilty" cases. One witness testified that she had overheard

Cross telling the judge in one case to "find this sucker guilty," and on another occasion, the defendant was found guilty after Cross's prompting to the judge even though the assistant district attorney at the hearing had attempted to withdraw the charge on the ground that the evidence did not demonstrate a violation. In yet another case, FBI agents recorded one of Cross's telephone conversations in which the husband of an accident victim called Cross and asked that the case against the woman who had caused the accident be heard first on its scheduled hearing date. In the course of their discussion, Cross asked, "You want her guilty, right?" and after the caller replied affirmatively, Cross assured him, "Guilty? No problem." App. at 915. Cross later told the victim's husband that "we'll burn her ass." App. at 925.

Nunzio Melograne also was seen speaking to police witnesses on at least one occasion before the police left the court before their hearings. In addition, he kept a notebook listing approximately 170 cases, and the name "Jules," again referring to Jules Melograne, appeared in connection

4

with 82 of those, many of which had been marked on Cross's trial list. At least three cases in which defendants were found not guilty were marked on Cross's trial calendar and listed in Nunzio Melograne's notebook with the name "Jules." And at least three cases in which a defendant was found guilty appeared in Nunzio Melograne's notebook with the word "guilty," including the one described above where the district attorney attempted to withdraw the charge.

The government based its civil rights charge on matters in which the conspirators had procured guilty verdicts--the "to be found guilty" cases. In these cases Cross and the Melogranes, the government charged, conspired to deprive defendants appearing before the Statutory Appeals Court of their fundamental due process right to a fair hearing before an impartial tribunal. The mail fraud convictions were based on the conspirators' agreement to deprive Pennsylvania and its citizens of their own honest services as public employees.[1] It was alleged that, in furtherance of this agreement, they caused the mail to be used to transmit notices of case dispositions to parties and the Pennsylvania Department of Transportation.

The district court properly exercised jurisdiction under 18 U.S.C. S 3231, and we invoke jurisdiction under 28 U.S.C. S 1291 to review the district court'sfinal order of conviction. Because each of Appellants' challenges is based on the district court's construction of statutes and case

law, we will exercise plenary review. Epstein Family
Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir.
1994).

II. Conspiracy to Violate Civil Rights

The statute under which the defendants were convicted,
18 U.S.C. S 241, makes it a crime for "two or more persons

_____

1. The government argued before us that the alleged mail fraud
conspiracy had two objectives: to deprive citizens of the honest services
of public employees and to deprive the Commonwealth of fines. Without
objection from the government, however, the case was submitted by the
district court to the jury as a conspiracy with the single objective of
depriving citizens of the honest services of the defendants. App. at 242-
43; 1109-11.

5

[to] conspire to injure . . . any person in any . . . state or
Commonwealth . . . in the free exercise or enjoyment of any
right or privilege secured to him by the Constitution or laws
of the United States." The evidence indicates that Cross and
the Melogranes agreed to use their best efforts to cause the
judge in the "to be found guilty" cases to consider factors
other than the merits of the case and to find against the
defendant. Cross and the Melogranes insist that they had
no fair notice that this agreement would violate S 241.
Because the fundamental due process right of a defendant
in a criminal case to an impartial tribunal is so well
established, and because that right is so clearly subverted
by an agreement of this kind, we reject the defendants'
contention that they had no fair notice.

The right to a fair and impartial trial for the resolution of
guilt lies at the very heart of the constitutional guarantee of
due process, as the case law of the Supreme Court and this
circuit reflects. In In re Murchison, 349 U.S. 133 (1955), a
Michigan judge who had presided over a one-person "judge-
grand jury" later, in separate proceedings, adjudged
witnesses in contempt for their conduct before him at the
hearing. Id. at 133-34. The Supreme Court held this to be
a violation of due process, opening its discussion of the law
with the following passage: "A fair trial in a fair tribunal is
a basic requirement of due process. Fairness of course
requires an absence of actual bias in the trial of cases. But
our system of law has always endeavored to prevent even
the probability of unfairness." Id. at 136. The Court warned
that " `[e]very procedure which would offer a possible
temptation to the average man as a judge . . . not to hold
the balance nice, clear, and true between the State and the

accused denies the latter due process of law.' " Id. (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)). Similarly, the Court held in Marshall v. Jerrico, Inc., 446 U.S. 238 (1980) that "[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." 446 U.S. at 242. Among the concerns protected by this rule, the Court noted, is the preservation of

> both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that

6

> justice has been done" by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed tofind against him.

Id. (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 172 (1951)).

This circuit has also clearly acknowledged the fundamental right to a fair and unbiased adjudication of guilt. We defined the basic elements of due process not simply as notice and the opportunity to be heard, 2 but "to be heard by a fair and impartial tribunal." Sill v. Pennsylvania State Univ., 462 F.2d 463, 469 (3d Cir. 1972) (emphasis added). Moreover, we announced unambiguously that "[i]f someone is deprived of his right to an impartial tribunal, then he is denied his constitutional right to due process, regardless of the magnitude of the individual and state interest at stake, the risk of error and the likely value of additional safeguards." United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 138 (3d Cir. 1985). Indeed, we emphasized that "[t]he unfairness that results from biased decisionmakers strikes so deeply at our sense of justice that it differs qualitatively from the injury that results from insufficient procedures." Id.

The defendants attempt to escape the clear import of these teachings by pointing out that they arose in the context of misconduct on the part of the decision maker, and that no decided case imposes criminal liability for violating S 241 by influencing or attempting to influence a

_____

2. The defendants claim that all of those whom they conspired to injure received the fundamental tenets of due process: notice and an opportunity to be heard. But due process cannot be satisfied when the

state provides a "hearing" at which the judge is not really listening or before which the decision has already been made. A myriad of cases hold that mere notice and hearing are not enough if "the state has contrived a conviction through the pretense of trial." See, e.g., Mooney v. Holohan, 294 U.S. 103, 112 (1935) (deliberate presentation of perjured testimony by the State); Napue v. Illinois, 360 U.S. 264 (1959) (same); Pyle v. Kansas, 317 U.S. 213 (1942) (same).

7

decision maker. However, where, as here, the civil right allegedly violated is defined in the preexisting case law in a way that gave clear notice that the defendant's proposed conduct would abridge it, a prior conviction on analogous facts is not necessary. This is clear from the Supreme Court's recent decision in United States v. Lanier, 117 S. Ct. 1219 (1997).

Lanier was convicted under 18 U.S.C. S 242 for violating the constitutional rights of five women by assaulting them sexually while he was serving as a state judge. Section 242 prohibits "the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" by anyone acting "under color of . . . law."3 The Sixth Circuit Court of Appeals set aside the conviction for "lack of any notice to the public that this ambiguous criminal statute included simple or sexual assault crimes within its coverage." United States v. Lanier, 73 F.3d 1380, 1384 (6th Cir. 1997). The Supreme Court unanimously reversed, holding that the Court of Appeals had employed an incorrect standard for determining whether particular conduct falls within the proscriptions of S 242. United States v. Lanier, 117 S. Ct. 1219 (1997). As the Court pointed out, the "touchstone is whether the statute, either standing alone or as construed by the courts, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 1225.

The Court of Appeals in Lanier recognized two prerequisites for a conviction under S 242: (1) a prior decision of the Supreme Court recognizing the constitutional right at issue, and (2) a prior conviction in a factual situation "fundamentally similar" to the one at bar. The Supreme Court rejected this view. It noted that no case has confined the range of relevant decisions to Supreme Court precedent. Id. at 1226. As for factual similarity, the Court pointed out that it had upheld convictions under S 241 despite "notable factual distinctions" between prior

_____

3. Section 242 is thus the substantive counterpart to the conspiracy statute in 18 U.S.C. S 241, which is the focus of this appeal. Section 241

forbids conspiracies to violate federally protected rights, whether the conspirators act under color of law or not.

decisions and the convictions at issue "so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." Id. at 1227. It conceded that "[i]n some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary." Id. "But," the Court continued,

> general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

This case falls squarely within the language just quoted. No earlier case leaves open whether prejudicing a judge against a defendant violates the defendant's right to a fair and impartial trial; rather, the "general constitutional rule already identified in the decisional law"--that people are entitled to fair adjudication of their guilt before an impartial tribunal--"applies with obvious clarity to the specific conduct in question." We therefore affirm the conviction for conspiracy to violate civil rights.

III. Mail Fraud Conspiracy

The defendants were convicted of a conspiracy that contemplated using the United States mail to deprive the Commonwealth of Pennsylvania and its citizens of the honest services of public employees. The indictment alleges that this agreement contemplated that the defendants would cause the following documents to be sent through the United States mail by the Statutory Appeals Court to the parties and the Department of Transportation ("DOT"): (1) notices of dismissals, (2) notices of convictions, and (3) "notices of favorable disposition." App. at 42, 51, 53. The government insists that the defendants contemplated that these documents would be sent through the mail in

furtherance of their conspiracy. While we agree that the record will support an inference that the defendants expected these notices to be dispatched by mail, we cannot uphold the defendants' mail fraud convictions on this basis. Because mailing of these notices was required by law as an integral and necessary part of the court's adjudication of cases, and because any deprivation of the honest services of public employees had been completed in each instance before the notice of disposition was mailed, the mailings of notices of case disposition as a matter of law were not in furtherance of the alleged conspiracy.

"The mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is part of the execution of the fraud." Kann v. United States, 323 U.S. 88, 95 (1944). As we explained in United States v. Tarnopol, 561 F.2d 466, 471-72 (3d Cir. 1977) (internal citations omitted):

> In each case the question is whether or not the "mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." Moreover . . . "the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." Thus, mailings taking place after the object of the scheme has been accomplished, or before its accomplishment has begun, are not sufficiently closely related to the scheme to support a mail fraud prosecution. Nor are routine mailings required by law which are themselves intrinsically innocent even though they take place during the course of carrying out a fraudulent scheme, the objective of which is the embezzlement of funds received in response to the mailings.

We derived these governing principles in Tarnopol in large part from Parr v. United States, 363 U.S. 370 (1960), a case factually similar to that before us. The defendants in Parr were charged with a scheme to embezzle funds from a public school district in Texas. The mailings alleged to have been in furtherance of their conspiracy included notices of tax assessments dispatched by the district to local

10

residents and the tax payments sent to it in response. Incoming tax revenue was either immediately converted by the defendants or deposited in the district's account, on

which the defendants issued and cashed checks payable to fictitious persons or in consideration of fictitious goods and services. The scheme also allegedly included the defendants' securing gasoline and other products and services with school district credit cards, with the knowledge that the mails would be used to collect from school funds. Although the Court acknowledged this "brazen scheme to defraud," it explained that the offenses described were essentially state crimes, and they would constitute federal mail fraud only if the mailings charged in the indictment were made " `for the purpose of executing such scheme.' " Parr, 363 U.S. at 385 (quoting 18 U.S.C. S 1341).

Because the district was legally compelled to assess and collect taxes for school purposes, and the taxpayers were legally obliged to respond, the Court held that the mailings in connection with the collection of revenue could not support a mail fraud conviction even though the scheme to embezzle could not have succeeded without tax revenue. Rejecting the government's arguments that the mailings, even if innocent in themselves, were "steps in a plot," the Court remarked that no case had ever held that "a thing which the law required to be mailed may be regarded as mailed for the purpose of executing a plot or scheme to defraud." Id. at 390. The Court stressed that: (1) the district was legally required to assess and collect taxes; (2) the indictment did not charge and the evidence did not prove that the taxes assessed exceeded the district's legitimate needs or that they were in any way unlawful; and (3) in fulfilling its legal duty to collect and report the receipt of taxes, the district was practically obliged to permit taxpayers to use the mail. Id. at 391. In a passage of central importance to this appeal, the Court summarized its holding with respect to the tax collection mailings as follows:

> [I]t cannot be said that mailings made for or caused to be made under the imperative command of duty imposed by state law are criminal under the federal

11

> mail fraud statute, even though some of those who are so required to do the mailing . . . plan to steal . . . some indefinite part of [the district's] moneys.

Id.

The Court also held that the mailings required to collect for the credit card purchases would not support a mail fraud conviction. The "scheme in each case had reached

fruition when [the defendants] received the goods and services . . . . It was immaterial . . . to any consummation of the scheme, how the [oil company] . . . would collect from the [District]." Id. at 393 (quoting Kann v. United States, 323 U.S. 88, 94 (1944)) (internal quotation mark omitted). Accordingly, it could not be said "that the mailings in question were for the purpose of executing the scheme, as the statute requires." Id.

Parr's holding with respect to the credit card portion of the scheme was followed in United States v. Maze, 414 U.S. 395 (1974). Maze also involved credit card fraud. The Court held that mailings of credit card invoices from a motel to a bank for the purpose of securing reimbursement for the goods and services supplied to Maze by the motel were not "for the purpose of executing [the defendant's] scheme." Id. at 405. The Court pointed out that Maze's "scheme reached fruition when he checked out of the motel." Id. at 414. In reaching its conclusion, the Court distinguished United States v. Sampson, 371 U.S. 75 (1962), on the ground that, while Maze had received no benefit from the mailings, the mailings in the Sampson scheme "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." Id. at 403.

We find this case indistinguishable from Parr. The Statutory Appeals Court was charged by law with adjudicating specified cases, just as the school district in Parr was charged with running a school system. Its mailings to the parties and the DOT, like the tax mailing in Parr, were required by law as a part of the court's exercise of its responsibilities. See Pa. R. Crim. P. 58(b)(2), 63(b)(2), 68(b)(2), 80, 9024, 9025; Pa. R. Civ. P. 236(a)(2); Pa. Stat.

12

Ann. tit. 75, S 6323 (West 1996). Given the volume of business that the court conducted, it had little choice but to transmit these required notifications by mail. The notices of dispositions dispatched by the court, like the tax mailings in Parr, performed precisely the function they were intended by law to perform: they faithfully reported the court's disposition of the case. As in Parr, the relevant mailings would, of necessity, have been made whether or not the conspiracy existed, and they would have performed precisely the same function in the absence of the conspiracy that they performed during its continuance.

We also find an analogy between this case and the credit card aspects of Parr and of Maze. The objective of this

conspiracy was to deprive citizens of the honest services of public employees charged with processing and adjudicating cases. That objective would "reach fruition" when the defendants' efforts caused a different disposition by the court than would otherwise have been made. In short, all that the conspirators needed to fix in order to achieve the object of their agreement was the disposition of a case. While routine mailings to the parties and the DOT and between the DOT and the parties could reasonably have been expected to follow in the ordinary execution of duties imposed by law, by the time notices of dispositions were dispatched, the conspiracy had either succeeded or failed, the legal consequences of an acquittal or conviction had been established, and the routine reporting of the dispositions simply was not a part of the conspirators' execution of their scheme. Nor did that routine reporting have the effect of lulling anyone into a false sense of security or otherwise making the conspirators' apprehension less likely.[4]

_____

4. Schmuck v. United States, 489 U.S. 705 (1989), a case relied upon heavily by the government, appears to us to support the position of the defendants. In Schmuck, a used car distributor was charged with devising and executing a scheme to defraud retail automobile customers by rolling back the odometers and inflating the prices he charged to dealers based on the lower mileage readings. The Court held that the mailing requirement was satisfied by the dealers' mailings of the title application forms. The Court distinguished Parr on the basis that the annual tax mailings in Parr continued regularly regardless of the

13

The scope of the federal mail fraud statute is limited. The Supreme Court has clearly held that legally required mailings in circumstances like those in this case cannot be deemed to have been made "for the purpose of executing" a fraudulent scheme. We therefore reverse the mail fraud conspiracy convictions.[5]

IV. Conclusion

For the reasons set forth above, we will affirm the convictions for conspiracy to violate civil rights and will reverse the convictions for conspiracy to commit mail fraud. We will remand for resentencing.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

scheme, while the mailings from the dealers in Schmuck were a direct result of and would not have occurred but for the fraudulent scheme. Schmuck, 489 U.S. at 713 n.7. Here also, the court regularly mailed notices to parties and the DOT in every case, whether or not the defendants had attempted to influence the result.

5. In a footnote in its brief, the government points to testimony that the defendants caused notices to be mailed of the time, date, and place of the hearings in the various cases. Appellee's Br. at 36 n.4. Even if these had been alleged in the indictment to be mailings in furtherance of the conspiracy, we could not sustain the defendants' mail fraud convictions on the basis of these notices. They too are a necessary part of the Statutory Appeals Court's carrying out its charge to adjudicate the cases within its jurisdiction. These notices were sent in all cases and their function was precisely the same during the conspiracy as it would have been without that conspiracy.

14