**IN RE: Michael LOWRY, Traffic Court Judge of Philadelphia County**

**No. 1 JD 13**

Court of Judicial Discipline of Pennsylvania

October 25, 2013

Hon. Robert A. Graci, Chief Counsel, Judicial Conduct Board, Francis J. Puskas, II, Deputy Chief Counsel, Judicial Conduct Board.

Samuel C. Stretton, Esquire, West Chester, PA, for Respondent.

BEFORE: Honorable Bernard L. McGinley, P.J., Honorable Charles A. Clement, Jr., Honorable John R. Cellucci, Honorable Timothy F. McCune, Honorable Robert J. Colville, Honorable Carmella Mullen, JJ.

OPINION BY PRESIDENT JUDGE McGINLEY

### I. *INTRODUCTION*

We have before us the Petition of the Judicial Conduct Board (Board) for an Interim Order Suspending Respondent, Michael Lowry, From His Judicial Office Without Pay, filed January 31, 2013. The Petition is based on an Indictment filed on January 29, 2013 in the United States District Court for the Eastern District of Pennsylvania, charging Respondent with felonies. The Board seeks this order under Article V, § 18(d)(2) of the Pennsylvania Constitution. That section provides:

> Prior to a hearing, the court may issue an interim order directing the suspension, with or without pay, of any justice, judge or justice of the peace against whom formal charges have been filed with the court by the board or against

whom has been filed an indictment or information charging a felony. An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.[1]

The Court heard oral argument on July 29, 2013 on the Board's Petition in addressing the question whether we should act to enter an order of interim suspension with or without pay under Section 18(d)(2) in this case and we also consider Respondent's Answer to the Board's Petition, filed June 21, 2013, and the respective Memoranda filed by the Board and the Respondent on the question whether Respondent's suspension should be with or without pay.

## II. *FINDINGS OF FACT*

Findings of Fact are set forth in the Discussion.

## III. *DISCUSSION*

The Indictment charging this Respondent, filed on January 29, 2013 in the United States District Court for the Eastern District of Pennsylvania, also charged five other "Traffic Court Judges" with conspiring to defraud the Commonwealth of Pennsylvania and the City of Philadelphia of fines and costs by engaging in a scheme of "ticket fixing" over a period of years. On February 1, 2013, the Supreme Court of Pennsylvania entered interim orders of suspension without pay against all six traffic court judges named in the Indictment. One of the other five judges named in the Indictment along with this Respondent was Judge Mark Bruno. Bruno filed an Answer in this Court to the Board's Petition for Interim Suspension Without Pay and, on May 24, 2013, this Court entered an order suspending Bruno with pay.[2]

In reviewing this 79–page Indictment against nine named defendants,[3] one is struck by the realization that federal investigators spent over three years (July 2008 to September 2011) (Indictment, para. 27, p. 10) investigating the daily activities of the defendants during which time thousands (actually hundreds of thousands) of cases came through the Traffic Court, i.e., were filed in Traffic Court during that time and disposed of by these defendants during that time.[4] One is struck then, upon review of the Indictment, which is the end product of the three-year investigation, that the federal

1. The Board filed an Amended Petition on June 5, 2013 correcting a mistake in its original filing in which it recited that the Indictment charged Respondent with one count of conspiracy to commit wire and mail fraud, 49 counts of wire fraud, 18 counts of mail fraud and one count of perjury; whereas, the Indictment charged Respondent with one count of conspiracy to commit wire and mail fraud, 9 counts of wire fraud, and one count of perjury.

2. This order is in conflict with the earlier order of the Pennsylvania Supreme Court, filed February 1, 2013, suspending Bruno without pay. It is this Court's position, set forth in an opinion accompanying the order in *Bruno* that since the Judiciary Article of the Pennsylvania Constitution was amended in 1993 the authority to issue interim orders of suspension, pursuant to Article V, Section 18, resides exclusively with the Court of Judicial Discipline. On July 11, 2013 the Supreme Court entered an order restoring Judge Bruno's pay retroactive to February 1, 2013 and scheduling argument on the jurisdictional question. Argument was heard on September 10, 2013.

3. Six judges and three non-judges are named defendants. Three other judges were "charged elsewhere" (Indictment, para. 29 at p. 10) (by Information).

4. See Appendix 1, *infra*, which sets forth statistics compiled by the Administrative Office of Pennsylvania Courts. This shows that the "Total Cases Disposed" for the years 2008, 2009, 2010 and 2011 to have been 253,515; 246,117; 203,574 and 202,788 respectively.

investigators, were able to identify only five cases in which they believed they had uncovered facts relating to the conduct of this Respondent, which, if alleged (in an Indictment) and proved (at trial), would establish any conduct of a criminal nature, specifically, here, the federal crime of wire fraud (18 U.S.C. § 1343). This court recognizes that prudent selectivity can be a virtue and, if that were the *modus operandi* of the federal investigators in this case, this court would expect that the five cases that "made the cut" would constitute conspicuously flagrant violations of the law and be easily and surely establishable as such. Instead, we find the opposite. This court finds that in *none of the five cases* does the Indictment contain allegations which even aver the elements of the federal crime of wire fraud.[5]

A close examination of the Indictment makes manifest the thorough failure of the Indictment to charge this Respondent with conspiracy and wire fraud.

### A. *The Conspiracy Charge,*

*No allegation adjudications corrupt or improper.*

In four of the five cases the Indictment alleges that this Respondent was the judge who adjudicated the case. In those four cases, that is *the only* connection which this Respondent is alleged to have had with the supposed criminality charged in those four cases.[6]

---

**5.** The Indictment does not charge this Respondent with any counts of mail fraud. Wire fraud only is charged: five cases involving nine counts. Each transmission alleged is alleged as a separate "Count"; sometimes more than one transmission is alleged in a given case.

**6.** Those four cases are:

Ticket No. 8 (Indictment, para. 54–63, pp. 32–33, Count 5).

This was exactly the situation in one of the cases in *In re Bruno,* 69 A.3d 780 (Pa.Ct.Jud.Disc.2013) in which Bruno was charged with participating in "the fix" by his adjudication of the case. This court pointed out:

> There is no allegation that Perri, Alfano, or anyone else spoke to Bruno about those citations nor any allegation that Bruno was asked by anyone to enter an adjudication of not guilty irrespective of the facts of the case. As a matter of fact, who is to say that Judge Bruno's finding was anything other than the delivery of justice in the case? The federal prosecutors *imply* otherwise but they have fashioned no allegation upon which a finding can legitimately be made that Judge Bruno's finding was corrupt—or even incorrect.[7]

*Id.* at 784. Likewise, there is no allegation in this Indictment that anyone spoke to Lowry about these four citations nor any allegation that he was asked by anyone to enter an adjudication of not guilty irrespective of the facts of the case.

As a matter of fact, in this case, the only participation by Lowry in the "fixing" of Ticket No. 8 is alleged in para. 61, p. 33 of the Indictment which avers:

> 61. On or about November 30, 2010, defendant MICHAEL LOWRY adjudicated the citation as guilty of a different offense, which was a lower offense and which reduced the fine and costs.

Ticket No. 10 (Indictment, para. 68–70, pp. 34–35, Count 8).
Ticket Nos. 26–29 (Indictment, para. 101–106, pp. 42–44, Count 22).
Ticket Nos. 32–33 (Indictment, para. 116–117, pp. 45–46, Count 28).

**7.** People can and frequently do disagree about whether a judge's decision is correct; judges often disagree with other judges, and appellate judges routinely reverse decisions made by lower court judges; but that does not make the lower court judge a criminal.

This court is surprised to learn that the federal investigators consider such a disposition to be a crime—a federal crime—for if it is, that crime is being committed by judges hundreds of times a day across the Commonwealth.

B. *The Wire Fraud Charges.*

(1) *Lowry did not participate in any interstate telephone calls. Calls not made in regular course of business.*

In two of the cases the Wire Transmission is stated to be an "interstate telephone call." These cases have to do with Ticket No. 8 and Ticket Nos. 26–29.

The elements of the crime of wire fraud are set out in 18 U.S.C. § 1343 as follows:

1. The defendant devised or intended to devise a scheme or artifice
   a. to defraud, or
   b. to obtain money or property by means of false or fraudulent pretenses, representations or promises, and
2. for the purpose of executing the scheme or artifice or attempting to do so,
3. the defendant knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals.

The Indictment alleges the essential element in establishing wire fraud in the case of Ticket No. 8 was an "interstate telephone call" made on November 30, 2010. See Indictment, para. 3, pp. 57–58 (Count 5). That interstate telephone call is described in para. 59, p. 33 of the Indictment as follows:

59. On or about November 30, 2010, in an interstate telephone call between Fortunato N. Perri, Sr., in Pennsylvania, and defendant HENRY P. ALFANO, in New Jersey, defendant ALFANO asked about the ticket. Perri said that it was a state police ticket and that he was "on top of it" and told ALFANO that "when

you give me something it's important brother."

This call is alleged to have been between *Perri* and *Alfano*. The Indictment contains no allegation that this Respondent was a participant in the call or knew anything about it.

The Indictment alleges the essential element in establishing wire fraud in the case of Ticket Nos. 26–29 was an "interstate telephone call" made on November 30, 2010. See Indictment, para. 3, pp. 57, 60 (Count 23). That telephone call is described in para. 103, p. 43 of the Indictment as follows;

103. On or about November 30, 2010, in an interstate telephone call between V.B., in New Jersey, and defendant WILLIAM HIRD, in Pennsylvania, V.B. asked defendant HIRD "how we make out for tomorrow?" HIRD, speaking in code, said, "I'm gonna see ya for coffee, ain't I?" V.B. said, "I just want to make sure," and HIRD responded, "I'm gonna be available for coffee." V.B. asked, "We're in good shape, then?" HIRD responded, "Yeah, I'll talk to you tomorrow for coffee." V.B. suggested that they meet at 8:30 a.m. to which HIRD responded, "closer to 9."

This call is alleged to have been between *V.B.* and *Hird.* Like Ticket No. 8, the Indictment contains no allegation that this Respondent was a participant in the call or knew anything about it.

As we pointed out in *Bruno, supra,* at 789–90, the federal prosecutors emphasize, however, in their "Guilty Plea Memorandum" filed in the case of *U.S. v. Fortunato N. Perri, Sr., supra* :

The government is not required to prove that the defendant actually used a wire communication in interstate commerce or that he even intended that anything be transmitted in interstate commerce by means of a wire

... communication to further, or to advance, or to carry out the scheme. *Id.* at 4–5, n. 3. However, further explaining the elements of the federal crime of wire fraud, the Memorandum goes on to say that:

> The government must show *that the defendant knew that the use of the wire communication would follow in the ordinary course of business or events,* or that the defendant should have anticipated that the wire communication in interstate commerce would be used. [Citing:] Third Circuit Instructions at 6.18.1343–1. (Emphasis added.)

The Indictment contains no allegation that Perri's call to Alfano was made in the ordinary course of business so that Bruno should have reasonably foreseen "that the wire communication in interstate commerce would be used." The obvious reason no such allegation is made in this case is that no such allegation is remotely supportable: Perri's call to Alfano described in paragraph 37 on pages 28–29 of the Indictment certainly cannot be credibly alleged to have been made in the ordinary course of business of the Traffic Court. The fact is that any allegations pertaining to foreseeability that the call would be made, and that it would be an interstate call—proof of which is essential in establishing the crime of wire fraud—are simply absent from this Indictment. These circumstances constitute substantive impediments to Bruno's conviction of wire fraud.

*Id.*

Likewise, here, in Lowry's case, the Indictment contains no allegation that Peril's call to Alfano described in para. 59 or that V.B.'s call to Hird described in para. 103 was made in the ordinary course of business so that Lowry should have reasonably foreseen "that the wire communication in interstate commerce would be used." As in *Bruno,* the obvious reason no such allegation is made in this case is that no such allegation is remotely supportable. Neither Perri's call to Alfano (para. 59) nor V.B.'s call to Hird (para. 103) can credibly be alleged to have been made in the ordinary course of business of the Traffic Court. As in *Bruno,* the fact is that any allegation pertaining to foreseeability that the call would be made, and that it would be an interstate call—proof of which is essential in establishing the crime of wire fraud—is simply absent from this Indictment. As in *Bruno,* these circumstances constitute substantive impediments to Lowry's conviction of wire fraud.

(2) *Wire communication did not occur until after adjudication so it was not in furtherance of the scheme.*

There is yet another reason why conviction of this Respondent of wire fraud in connection with Ticket No. 8 appears to be improbable. We discussed this very same reason in *In re Bruno, supra,* at 787–90 and held that it presented a "substantive impediment" to Bruno's conviction (*Id.* at 790). It is no less an impediment to Lowry's conviction with respect not only to Ticket No. 8 (Count 5) but also with respect to Ticket No. 10 (Count 8), Ticket Nos. 32–33 (Count 28) and Ticket No. 42 (Count 38).

On this point in *Bruno,* we referred to the case of *United States v. Walter Cross, Jules Melograne and Nunzio Melograne,* 128 F.3d 145 (3d Cir.1997) and described the substantive impediment which that case (and others) provided to Bruno's conviction. There we pointed out that:

> Jules Melograne was a judge on the Statutory Appeals Court in Allegheny County which exercised *de novo* review of traffic offenses. Cross was the supervisor of the court and Nunzio Melograne

was a tipstaff in that court. They were charged with "fixing" traffic tickets so as to achieve "Not Guilty" dispositions in some cases and "Guilty" dispositions in some cases. They were convicted of conspiracy to deprive Pennsylvania residents of their civil right to a fair trial and of conspiracy to commit mail fraud. On appeal, the United States Court of Appeals for the Third Circuit affirmed the convictions to deprive residents of their civil rights but *reversed* the convictions of conspiracy to commit mail fraud.[8]

\* \* \* \*

The Third Circuit held:

> We cannot uphold the defendants' mail fraud convictions ... because any deprivation of the honest services of public employees had been completed in each instance before notice of the disposition was mailed, the mailings of notices of case disposition as a matter of law were not in furtherance of the alleged conspiracy.

*United States v. Cross and Melograne, supra* at 150. The court of appeals pointed out that:

> The mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is part of the execution of the fraud. [Citing] *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944).

The court then cited its own opinion *United States v. Tarnopol,* 561 F.2d 466,

471–72 (3d Cir.1977) and quoted the following portion of that opinion.

> In each case the question is whether or not the "mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." Moreover ... "the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." *Thus, mailings taking place after the object of the scheme has been accomplished,* or before its accomplishment has begun, *are not sufficiently closely related to the scheme to support a mail fraud prosecution.* (Emphasis added.)

*Id.* See, also, *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). *Maze* is instructive for there Maze stole a credit card and used it when he checked into a motel. The Supreme Court held that the subsequent mailings of the credit card invoices to a bank by the motel for payment of Maze's evening there were not "for the purpose of executing [the defendant's] scheme." *Id.* at 405, 94 S.Ct. 645. The court pointed out that "Maze's scheme reached fruition when he checked out of the motel." *Id.* at 414, 94 S.Ct. 645. Following the Supreme Court's reason-

---

**8.** The language of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) is identical and has been interpreted so, the cases on one providing precedent for cases on the other. *Pasquantino v. United States,* 544 U.S. 349, 355, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005); *United States v. Gimbel,* 830 F.2d 621, 627 (7th Cir.1987); *United States v. Schwartz,* 924 F.2d 410, 416 (2d Cir.1991). *See, also, United States v. Sullivan, et al.,* No. 2:13–cr–00039 U.S.D.C.E.D.Pa., 2013 WL 3305217 (2013)

where the district court said: "The same legal analysis applies to both the mail and wire fraud statutes because they share the same relevant language." *See, Carpenter v. United States,* 484 U.S. 19, 25, n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (noting that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both offenses here").

ing, in *Cross and Melograne*, the Third Circuit held that:

> [The] objective [of depriving citizens of the honest services of public employees] would "reach fruition" when the defendants' efforts caused a different disposition by the court than would otherwise have been made. In short, all that the conspirators needed to fix in order to achieve the object of their agreement was the disposition of a case … by the time notices or dispositions were dispatched, the conspiracy had either succeeded or failed, the legal consequences of an acquittal or conviction had been established, and the routine reporting of the dispositions simply was not a part of the conspirators' execution of their scheme.

*Id.* at 151–52.

Obviously, then, it is critical to know the date on which the adjudication was made and the date on which the Wire Transmission was made, for, if the latter took place after the case was adjudicated, then it was not "in furtherance of the alleged conspiracy" (*Id.* at 150)—"not a part of the conspirators' execution of their scheme," (*Id.* at 152)—and, thus, cannot support a charge of wire fraud.

The Indictment of Lowry sets out the dates the Wire Transmissions took place for the tickets addressed in this section Third as well as the dates on which the adjudication of those tickets took place. In each case the "Wire Transmission" is stated to be "Interstate computer transmission of adjudication batch." The Indictment explains just what this "transmission" was in para. 11, p. 5 as follows:

> 11. Every adjudication was entered into a database maintained by the Traffic Court computer system. *Thereafter,* the ticketholder's file was electronically sent to XEROX (formerly ACS), an information technology contractor, located in Tarrytown, New York. (Emphasis added.)

Thus, the Indictment appropriately:

— alleges that a "wire communication" was "transmitted,"

— includes a description of the information transmitted,

— alleges that it was actually a communication "in interstate commerce," i.e., it alleges that it was sent from Traffic Court in Pennsylvania to Tarrytown, New York (from somebody to somebody else).

See 18 U.S.C. § 1343. And the Indictment states the respective dates of the adjudications and Wire Transmissions to be:

Ticket No. 10 (Count 8).

Date of Adjudication—May 27, 2011 (Indictment, para. 70, p. 35).

Date of Wire Transmission—May 30, 2011 (Indictment, para. 3, p. 58, Count 8).

Ticket Nos. 32–33 (Count 28).

Date of Adjudication—August 30, 2010 (Indictment, para. 117, p. 46).

Date of Wire Transmission—September 1, 2010 (Indictment, para. 3, p. 60, Count 28).

Ticket No. 42 (Count 38).

Date of Adjudication—December 22, 2009 (Indictment, para. 131, p. 48).

Date of Wire Transmission—December 24, 2009 (Indictment, para. 3, p. 61, Count 38).

Thus, the Indictment itself, with precision, recites that the Wire Transmissions, asserted *as if* they were made in furtherance of the scheme, did not take place until after the adjudication had been made, and thus were *not made* in furtherance of the scheme. Of course, in para. 11, p. 5, the Indictment makes an across-the-board allegation that in each and every case where the Wire Transmission is alleged to be "Interstate transmission of adjudication batch" (as in Counts 8, 28 and 38) the

transmission was made after the adjudication was made ("Thereafter") and entered in the Traffic Court database. Of course, this is nothing more than a recognition that nothing can be sent until it exists—a fundamental concept.

It is hard to see how Lowry will be convicted of wire fraud as charged in Counts 8, 28 and 38 in view of the facts set out above all taken from the Indictment itself. As in *Bruno*, those facts certainly present a "substantive impediment" to convictions.

Respecting, lastly, Count 5, charged in connection with Ticket No. 8, the designated Wire Transmission is an "Interstate telephone call" said to have been made November 30, 2010. See Indictment, para. 3, pp. 57–58 (Count 5). The description of events supposedly supporting the charge of wire fraud against Lowry is set out in the Indictment at para. 54–63, pp. 32–33. There are a number of phone calls referred to in those paragraphs but only one is alleged to be an "interstate" call. That call is described in para. 59, p. 33 of the Indictment.[9] Paragraph 61 alleges that Lowry adjudicated the case on November 30, 2010 (the same day as the phone call). (*Id.*)

The problem for the government is that it makes no allegation in the Indictment that the interstate telephone call of November 30, 2010 (Indictment, para. 59) was made *before* Lowry's adjudication of that same date. As pointed out, this is an essential element of the crime of wire fraud and the onus is on the government to establish that element; to prove it at trial (beyond a reasonable doubt) and, of course, to allege it in an Indictment. There is no burden placed on a defendant to engage in interpolations or extrapolations of imprecise language set aswim by the government in an Indictment. The law requires that the Wire Transmission occur before the adjudication. The government knows this essential element *must* be alleged; if it is not alleged, the only possible conclusion—the only permissible conclusion—is that it *can't* be alleged because the government has no facts to support it.

(3) *Wire Transmission alleged to be "Interstate computer check of citation" but Indictment alleges no facts to support an interstate transmission.*

"Interstate computer check of citation" is the Wire Transmission alleged to support the wire fraud charges on the following tickets:

Ticket No. 8, Count 6 (Indictment, para. 3, p. 58).

Ticket Nos. 26–29, Count 22 (Indictment, para. 3, p. 60).

Ticket Nos. 32–33, Count 27 (Indictment, para. 3, p. 60).

Ticket No. 42, Count 37 (Indictment, para. 3, p. 61).

The Indictment, however, contains no allegation of fact as to who made the "check," what he/she was checking for (except with respect to Ticket No. 42, Count 37),[10] or

---

**9.** We have pointed out *supra*: a) that this call was between Perri and Alfano—Lowry was not a participant—and b) was not in the regular course of business so that Lowry could not reasonably have been expected that it would be made. *See, supra,* at pp. 32–33 and *In re Bruno,* 69 A.3d 780 (Pa.Ct.Jud.Disc.2013) and, therefore, for those other reasons, cannot support a wire fraud charge against Lowry.

**10.** In the case of Ticket No. 42, Count 37, the Indictment does contain a reference to the "check." In para. 130, p. 48 it is alleged that: "Sometime after October 18, 2009, K.O. [Lowry's personal assistant] checked the Traffic Court computer system to determine which judge was assigned to F.L.'s trial." Noticeably absent from the Indictment regarding Count 37 is any allegation of what states combined to give the "check" its critical "interstate" character.

how it gets to be an "interstate check." There is simply no reference to the "check" except the wholly conclusory word "interstate" which is used to describe the Wire Transmission in the paragraphs of the Indictment listed above for Counts 6, 22 and 27. It is readily seen that this is an overt and undisguised disregard for federal requirements for specificity in an Indictment. *See, United States v. Schmitz,* 634 F.3d 1247, 1261 (11th Cir.2011) where the Court of Appeals said:

> Even when an indictment "tracks the language of the statute, 'it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the general specific offense, coming under the general description, with which he is charged.'" *United States v. Bobo,* 344 F.3d 1076, 1083 (11th Cir.2003) (citing *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1048–49, 8 L.Ed.2d 240 (1962)). Counts Five, Six, Seven, and Eight simply allege that Schmitz did "embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply" the salary and other benefits she received from the CITY Program. (Dkt. 1 at 5–6.) While this language tracks 18 U.S.C. § 666, the federal-funds counts allege no facts or circumstances that inform Schmitz of these specific charges. As a result, the allegations of fraud in the federal-funds counts are insufficient as a matter of law.

■ An indictment's "primary office" is "to inform the defendant of the nature of the accusation against him." *United States v. Saybolt,* 577 F.3d 195, 205 (3d Cir.2009), citing *Russell v. United States,* 369 U.S. 749, 767, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). In *Saybolt,* the court went on to explain that:

> This is accomplished by identifying the law that is alleged to have been violated and including factual allegations that sufficiently apprise the defendant of the offending conduct. See Fed.R.Crim.P. 7(c) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.... For each count, the indictment or information must give the official or customary citation of the ... provision of law that the defendant is alleged to have violated."); *Hamling v. United States,* 418 U.S. 87, 117–18, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (" 'Undoubtedly, the language of the statute may be used in the general description of an offense, *but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense,* coming under the general description, with which he is charged.'" (quoting *United States v. Hess,* 124 U.S. 483, 487, 8 S.Ct. 571, 31 L.Ed. 516 (1888))). (Emphasis added.)

We note the federal prosecutors had no trouble formulating the allegations in the Indictment which inform of the interstate nature of the communications with respect to "interstate telephone calls" (in each instance alleged to have been from Pennsylvania to New Jersey) and with respect to "interstate transmission of adjudication batch" (all alleged to have been made from Pennsylvania to New York). In contrast, when the essential element is stated to be "interstate computer check of citation" no such allegations are made. The inescapable implication, of course, is that the allegations are not made in the cases where an "interstate computer check of citation" is alleged to be the essential wire transmission because these "checks" are not interstate. All indications are that they are certainly not.

On its face we see the activity described in para. 130, p. 48 of the Indictment ("interstate computer check of citation") as a perfect example of an *intra*state use of the

computer. It describes a Traffic Court employee going to his computer station at the Traffic Court, clicking on the case in which he is interested, learning the name of the assigned judge, turning his computer off and going about his business—all within the offices of the Traffic Court, He "transmitted" nothing; and any "wire communication" was with himself.

(4) *The City and the Commonwealth have no property interest in fines and costs prior to a determination of guilt.*

We here adopt what we said in *In re Bruno,* 69 A.3d 780 (Pa.Ct.Jud.Disc.2013) at §(a) iv, and incorporate it in this opinion.

We are aware that the United States District Court denied the Motions To Dismiss filed by the defendants in that court (*U.S. v. Sullivan, et al.,* No. 2:13–cr–00039, U.S.D.C.E.D.Pa., 2013 WL 3305217 (2013)), which were based on this same deficiency in the Indictment. Thus, the Indictment survived a Rule 12(b)(3)(B) Motion;[11] but that does not alter the obligation of the federal prosecutors to establish that the City and Commonwealth have been deprived of a property right within the meaning of the wire fraud statute. *The Indictment itself* affirmatively avers that a finding of guilt is a *sine qua non* for the establishment of a "property right" under the statute. For example, *the Indictment itself* avers "Traffic Court was responsible for the collection of fines and court costs resulting from *guilty pleas* and *findings of guilt*" (Indictment, para. 5, p. 3); "*Guilty adjudications* subjected a vio-

lator to statutorily determined fines and costs of court" (*Id.,* para. 8, p. 4); "*Upon an adjudication of not guilty or dismissal* the ticketholder did not pay any fines or costs" (*Id.,* para. 10, p. 5). As we pointed out in *Bruno,* "Neither the City nor the Commonwealth is legally entitled to fines and costs from an *alleged* traffic offender." *In re Bruno, supra.*

Given, then, the undeniable factual constraints of this case, we see the federal prosecutors having a hard time putting together an Indictment which includes allegations that the City and Commonwealth have a "property right" (an essential element of the crime charged) in fines and costs (admittedly) not legally due—in fact, in this case, it is *impossible* for them to do so. However, whether that state of affairs is the product of cleverness, or luck, or simply by dint of circumstances, it is not for a court to solve the prosecutors' problem by simply eliminating the troublesome obligation to establish a "property right" in the face of congressional intent and the holdings of the United States Supreme Court.

In addition, this court notes that federal courts are given general guidance in interpretation of the mail fraud statute by the United States Supreme Court in *United States v. McNally,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), where that court held that "the mail fraud statute, as we have indicated, had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder."[12] *Id.* at 359, 107 S.Ct.

---

11. We note, however, that, in the face of that Motion, the government abandoned its theory, set out repeatedly and at length in the Indictment, "that the ticket-pricing [sic] scheme [violated the Mail and Wire Fraud Statutes in that it] deprived the Commonwealth of property in the form of its ability to regulate safe drivers on the roadways through licensing

suspensions and restrictions." *Id.* at 6, n. 6. In view of the numerous, clear federal cases holding that regulatory motives or regulatory ends can never support mail or wire fraud charges, the advancement of this theory was always frivolous (or irresponsible).

12. *See,* n. 8 *supra.*

2875.

The court went on to say:

We believe that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such schemes. The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. [Citations omitted.] ... *Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.* (Emphasis added.)

*Id.* at 359–60, 107 S.Ct. 2875.

We believe that the core theme from which come the Supreme Court's observations in *McNally,* quoted above, which we find particularly applicable here, is that it is not important that this Respondent be guilty of the federal crime of wire fraud—and certainly not by stretching the intended reach of the statute. Interstate commerce will suffer no impairment, and the wherewithal of the Commonwealth of Pennsylvania to manage the behavior of its citizens will not be diminished—including that to manage the behavior of those who happen to be judicial officers.

C. *The Perjury Charge.*

The Indictment, in Count 69, p. 67 charges:

1. Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2. On or about October 25, 2011, in the Eastern District of Pennsylvania, defendant MICHAEL LOWRY, while under oath and testifying in a proceeding before a grand jury of the United States in the Eastern District of Pennsylvania, knowingly made a false material declaration.

3. The grand jury empaneled on or about February 4, 2011, was conducting an investigation to determine, in part, whether individuals at and associated with Traffic Court engaged in the manipulation of tickets outside the judicial process, commonly known as "ticket-fixing" and referred to as "consideration." It was material to this investigation to determine which individuals, and specifically which judges, participated in this practice.

4. With respect to this material matter, referring to requests for consideration, defendant MICHAEL LOWRY testified as follows, at page 49 of the transcript:

Q. Your testimony is you don't give out special favors: is that right?

A. No, I treat everybody in that courtroom the same.

5. The testimony of defendant MICHAEL LOWRY, as he then and there well knew and believed, was false, in that LOWRY did give out special favors, in that he accepted and was influenced by "consideration" requests from other judges and individuals.

As set forth above at some length, the Indictment refers to four cases which this Respondent adjudicated (see pp. 4–5, *supra* ). In three of those cases he found the defendant "not guilty." In the other case he found the defendant "guilty" of a lesser included offense—a common occurrence in the courts of Pennsylvania. As pointed out on the pages referred to above there is no allegation that he was asked to "give out special favors" in any of those cases or that those adjudications were corrupt or even incorrect; there is nothing in the

Indictment to suggest that those adjudications provided anything less than perfect justice.[13]

The question which Respondent is charged with answering untruthfully: "Q. Your testimony is you don't give out special favors: is that right?" is directed at and limited, by the Indictment itself, to the four adjudications specified in the Indictment for those are the only occasions mentioned in the Indictment when Respondent would have had any opportunity to give out "special favors," i.e., by a corrupt adjudication. Moreover, these are the only cases which the prosecutors have even attempted to bring within the compass of the wire fraud statute—by alleging an interstate wire communication in those four cases as the essential element of the crime. As we have seen, (see pp. 5–13), this prosecutorial exertion has been a complete waste of time inasmuch as each Overt Act, each for its own reason, demonstrably fails to support the charges of wire fraud it is alleged to support. It has been pointed out—repeatedly now—that there is no evidence, no allegation, no charge that anybody spoke to Respondent about any of those cases much less requested or suggested that he enter an adjudication not in accord with the facts and the law. Consequently, Respondent's answer to the question: "A. No, I treat everybody in that courtroom the same." constituted a denial that he gave out any "special favors" in those cases and is in full accord with the Indictment. Moreover, the allegations of paragraph 5 of the perjury charge;

5. The testimony of defendant MICHAEL LOWRY, as he then and there well knew and believed, was false, in that LOWRY did give out special favors, in that he accepted and was influenced

by "consideration" requests from other judges and individuals.

are themselves false—and certainly unsupported by any evidence or allegations that "Lowry did give out special favors, in that he accepted and was influenced by 'consideration' requests from other judges and individuals" for in the four cases selected by the federal prosecutors to charge Respondent with giving out "special favors" in violation of the wire fraud statute *there were no* "requests from other judges and individuals"—and none are alleged in this Indictment.

## IV. CONCLUSION

We think that the foregoing review of the Indictment creates serious uncertainty that Respondent will be convicted of any of the charges and so we must do our work here with that in mind—and our work here must be done "prior to a hearing." Under these circumstances we believe that, if Respondent were to continue to hear cases while the charges are unresolved, there could be a possible negative impact on the administration of justice and could possibly harm the public confidence in the judiciary. As a consequence, so long as the charges are pending and unresolved, interim suspension is called for. This leads us to the ultimate question here: whether suspension with pay is appropriate and sufficient in this case to allay the possible harm to public confidence in the judicial system and the possible negative impact on the administration of justice in the Commonwealth—or whether that can only be accomplished by suspension without pay.

In earlier cases we have held that these decisions should be made only after a consideration of the "totality of the circum-

---

13. Nor is there any suggestion in this Indictment that Respondent received any benefit for making these adjudications.

stances ... with each case being decided on its own facts." *In re Larsen*, 655 A.2d 239, 242 (Pa.Ct.Jud.Disc.1994); *see, also, In re Smith*, 712 A.2d 849, 851–52 (Pa.Ct. Jud.Disc.1998).

In reviewing the earlier interim suspension cases, one thing stands out: on only two occasions has this Court entered an order of interim suspension without pay.[14] This statistic was emphasized by Respondent in *In re Melvin*, 57 A.3d 226 (Pa.Ct. Jud.Disc.2012) in her argument that her suspension should be with pay. We observed that:

> The point is well taken and we acknowledge it; but what it signifies is that this Court has been reluctant to suspend without pay [prior to a hearing] and has been careful to do so only in the most egregious cases....

*Id.* at 240. And indeed the two cases were egregious. In *In re Jaffe*, 814 A.2d 308 (Pa.Ct.Jud.Disc.2003), the Respondent was charged with extorting large sums of money from two lawyers who represented numerous plaintiffs in cases before him; and in *In re Melvin, supra*, Respondent was charged with crimes which included forcing and coercing her employees (secretaries and law clerks) to commit crimes, to aid her to commit crimes, and to violate an order of the Supreme Court. The conduct with which Judge Lowry is charged does not approximate the conduct of Respondents in the *Jaffe* and *Melvin* cases for in no way is it imbued with the gravity and the overt disdain for the law on display in those cases.

In *Bruno, supra* at 797, in considering whether interim suspensions should be with or without pay, we referred to a number of "ticket fixing" cases including *In re Joyce*, 712 A.2d 834 (Pa.Ct.Jud.Disc. 1998); *In re Terrick*, 712 A.2d 834 (Pa.Ct. Jud.Disc.1998); *In re Trkula*, 699 A.2d 3 (Pa.Ct.Jud.Disc.1997) in which cases no interim suspensions were sought. We also referred to the case of Jules Melograne who was charged with fixing hundreds of cases in Allegheny County in the early 1990s and whom the Supreme Court suspended *with* pay. Against this background, suspending this Respondent *without* pay would be a holding—a declaration—that the public is scandalized to a greater degree by the allegations against Lowry, the deficiencies of which are set out in detail above, to support the charges than by charges of fixing hundreds of cases over a long period of years made against Melograne, who was suspended *with* pay. We will not make that holding or that declaration, for, by any measure, the totality of the circumstances requires that this Respondent's interim suspension be with pay.

## ORDER

PER CURIAM

AND NOW, this 25th day of October, 2013, upon consideration of the Judicial Conduct Board's Petition for Suspension of Respondent Without Pay, and of Respondent's Answer thereto, and of the Amended Petition of the Judicial Conduct Board for Interim Suspension of Respondent Without Pay, and arguments made on July 29, 2013, and upon the respective Memoranda filed by the Judicial Conduct Board and Respondent, upon the authority conferred on this Court in Article V, Section 18(d)(2) of the Pennsylvania Constitution,

14. We recently entered a third interim order of suspension without pay in *In re Sullivan*, 74 A.3d 1187 (Pa.Ct.Jud.Disc.2013). Sullivan was a Traffic Court judge and is one of the defendants named in this Indictment. The reasons for that order are set forth in our opinion in that case at slip op., pp. 5–8. Review of that opinion will readily reveal the differences between the allegations against Sullivan and those against Lowry and demonstrate why they call for different orders.

the said Petition is denied, and it is hereby ORDERED that the Respondent is suspended with pay until further Order of this Court.

This Order is effective as of February 1, 2013 and any compensation which has been withheld from Respondent since that date shall be immediately paid to him.